**LITE DEPALMA GREENBERG, LLC**
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
bgreenberg@litedepalma.com

**POMERANTZ, LLP**
Jeremy A. Lieberman
C. Dovi Berger
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JIE LI, Individually and On Behalf of All Others Similarly Situated, | **Case No.** |
| Plaintiff, | **CLASS ACTION** |
| v. | **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| CORMEDIX, INC., JOHN C. HOUGHTON, BRIAN LENZ, RICHARD M. COHEN, RANDY MILBY, STEVEN LEFKOWITZ, and HARRY O'GRADY, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Jie Li ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding CorMedix, Inc.,

1

497206.1

("CorMedix" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired CorMedix securities between March 12, 2011 and June 29, 2015, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     CorMedix Inc., a pharmaceutical company, seeks to license, develop, and commercialize therapeutic products for the prevention and treatment of cardiac, renal, and infectious diseases. The Company markets Neutrolin, a catheter lock solution for the prevention of catheter related bloodstream infections and maintenance of catheter patency in tunneled, cuffed, and central venous catheters used for vascular access in hemodialysis patients. Its product candidate is CRMD004, which is the gel formulation of Neutrolin intended for the treatment of wounds, skin infections, soft tissue infections, and the prevention of catheter exit site infections. The Company was formerly known as Picton Holding Company, Inc. and changed its name to CorMedix Inc. in January 2007. CorMedix Inc. was founded in 2006, is based in Bedminster, New Jersey, and its shares trade on the NYSE under the ticker symbol "CRMD".

3.     Throughout the Class Period, defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically,

497206.1

defendants made false and/or misleading statements and/or failed to disclose that: (1) CorMedix's announcements regarding its partnership discussions and imminent Phase 3 trials for its sole product, Neutrolin, were materially false and misleading  (2) clinical studies touted by CorMedix were misleading and overstated  Neutrolin's effectiveness when in fact Neutrolin offers no benefit compared to current industry protocols; (3) CorMedix overstated the cost effectiveness of Neutrolin compared to currently established medical protocols; (4) CorMedix's market claims for Neutrolin were overstated; (5) CorMedix stock achieved an unsustainable valuation by using paid stock promoters, yet failed to disclose the use of such promoters in its regulatory filings pursuant to Section 17(b) of the Securities Act of 1933; (6) CorMedix insiders enriched themselves at the expense of shareholders by selling stock at inflated prices; and (7) as a result of the foregoing, CorMedix's public statements were materially false and misleading at all relevant times.

4.      On June 29, 2015, an article by *The Pump Stopper* published on *Seeking Alpha* alleged that 1) personnel involved in the formation of CorMedix had faced prior accusations of fraud; 2) Neutrolin's performance in clinical trials was vastly overstated; and 3) the Company had engaged stock promoters in order to inflate the Company's share price.

5.      As a result of this news, shares of CorMedix fell $0.81, or over 16.6%, on unusually heavy volume, to close at $4.05 on June 29, 2015.

6.      As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

497206.1

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

9.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as defendant is headquartered in this District and a significant portion of the defendants' actions, and the subsequent damages, took place within this District.

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

11.     Plaintiff, as set forth in the attached Certification, acquired CorMedix securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

12.     Defendant CorMedix is a Delaware corporation with its principal executive offices located at 1430 US Highway 206, Suite 200, Bedminster, NJ 07921.   CorMedix's common stock trades on the NYSE under the ticker symbol "CRMD."

13.     Defendant John C. Houghton ("Houghton") has served at all relevant times until September 30, 2011 as the Company's Chief Executive Officer ("CEO") and Director.

497206.1

14.     Defendant Brian Lenz ("Lenz") has served at all relevant times until April 30, 2012 as the Company's Chief Financial Officer ("CFO"), Secretary and Treasurer.

15.     Defendant Richard M. Cohen ("Cohen") served as the Company's interim CEO from September 30, 2011 through December 31, 2012, and as interim CFO from April 30, 2012 through August 15, 2013.

16.     Defendant Randy Milby ("Milby") has served at all relevant times, beginning January 1, 2013, as the Company's Chief Executive Officer ("CEO"). Additionally, from May 3, 2012 until December 31, 2012, Milby served as the Company's Chief Operating Officer ("COO").

17.     Defendant Steven Lefkowitz ("Lefkowitz") served as the Company's interim CFO from August 15, 2013 through July 21, 2014.

18.     Defendant Harry O'Grady ("O'Grady") has served at all relevant times beginning July 21, 2014 as the Company's Chief Financial Officer.

19.     The defendants referenced above in ¶¶ 18 - 24 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

20.     CorMedix Inc., a pharmaceutical company, intends to develop and commercialize therapeutic products for the prevention and treatment of cardiac, renal, and infectious diseases. The Company markets Neutrolin, a catheter lock solution for the prevention of catheter related bloodstream infections and maintenance of catheter patency in tunneled, cuffed, and central venous catheters used for vascular access in hemodialysis patients. Its product candidate is CRMD004, which is the gel formulation of Neutrolin intended for the treatment of wounds, skin

497206.1

infections, soft tissue infections, and the prevention of catheter exit site infections. The Company was formerly known as Picton Holding Company, Inc. and changed its name to CorMedix Inc. in January 2007. CorMedix Inc. was founded in 2006, is based in Bedminster, New Jersey, and its shares trades on the NYSE under the ticker symbol "CRMD".

## Securities Laws On Stock Promotion

21.     Section 17(b) of the Securities Act of 1933 [15 U.S.C. 77q(b)] is commonly known as the "anti-touting" provision. It prohibits publicizing information about a security without "fully disclosing" any consideration received or to be received, directly or indirectly, from the issuer, and the amount thereof. *Id.*  Moreover, an issuer of securities is also required to disclose the details of its relationship with a stock promoter in its regulatory filings.

## Materially False and Misleading
## Statements Issued During the Period

22.     On March 11, 2011, after the close of trading, the Company issued a press release and filed a Form 8-K with the SEC, announcing its financial and operating results for the year ended December 31, 2010. The Company reported a net loss for of $10.9 million, or $1.15 per diluted share, on no revenue, compared to a net loss of $8.1 million, or $9.48 per diluted share, on no revenue, for the year ended December 31, 2009.

23.     In the press release, the Company sated, in part:

Commenting on year-end results, CorMedix President and CEO, John C. Houghton, stated, "We continue to make great progress toward the commercialization of our lead product candidates, CRMD001 Deferiprone and CRMD003 Neutrolin®. CRMD001 Deferiprone has been actively enrolling patients in a phase II clinical trial for the prevention of CIN. We expect to have an interim analysis from this study by the end of the first quarter of 2011 and to report final results in the second half of 2011, which will serve as the basis for a phase III clinical trial decision. Our first manufacturing run of CRMD003 Neutrolin® proved successful and positions us well to provide product for our anticipated upcoming 2011 clinical studies. We expect to be in a position to launch CRMD003 Neutrolin® for the prevention of CRBI and maintenance of

497206.1

catheter patency in hemodialysis patients in Europe by the end of 2011, subject to receiving CE Mark approval in Europe."

24.     On March 11, 2011, the Company also filed an annual report on Form 10-K with the SEC which was signed by Defendants Houghton and Lenz, and reiterated the Company's previously announced quarterly and fiscal year-end financial results and financial position. In addition, the 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Houghton and Lenz, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

25.     On May 10, 2011, the Company issued a press release and filed a Form 8-K with the SEC, announcing its financial and operating results for the first quarter ending March 31, 2011. The Company reported a net loss of $1.98 million, or $0.17 per diluted share, on no revenue, compared to a net loss of $6.47 million, or $6.06 per diluted share, on no revenue, for the same period in the prior year.

26.     In the press release, the Company stated, in part:

**Management Commentary**

Commenting on the quarterly results, CorMedix President and CEO, John C. Houghton, stated, "We are pleased with our continued enrollment of our phase II study with CRMD001 and we look forward to submitting an amendment to our IDE application for CRMD003 with the FDA by the end of the first half 2011. However, we have recently been informed by the notified body managing our CE Mark application that the required reviews by European regulatory authorities are expected to take several months longer than originally anticipated. As a result, although we will continue to aggressively pursue the advancement of the application process and collaborate with the European regulatory authorities, we now expect that the timing for potential receipt of CE Mark approval will be during the first half of 2012."

497206.1

**Update on Upcoming Milestones**

- Expect to submit an amendment to our Investigational Device Exemption ("IDE") application with the Food and Drug Administration ("FDA") for CRMD003 (Neutrolin®) by the end of the first half of 2011;

- Subject to FDA approval of the IDE, expect to initiate a pivotal clinical trial for CRMD003 (Neutrolin®) by the end of the first half of 2011;

- Expect to complete initial submission to notified body of all critical path documentation required for CE Mark application process by the end of the first half of 2011; and

- Subject to receiving CE Mark approval, expect to be in a position to launch CRMD003 Neutrolin® for the prevention of catheter related bloodstream infection and maintenance of catheter patency in hemodialysis patients in Europe during the first half of 2012.

27.     On May 10, 2011, the Company also filed a quarterly report on Form 10-Q with the SEC which was signed by Defendants Houghton and Lenz, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Houghton and Lenz, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

28.     On August 9, 2011, the Company issued a press release and filed a Form 8-K with the SEC, announcing its financial and operating results for the second quarter ending June 30, 2011. The Company reported a net loss of $2.48 million, or $0.22 per diluted share, on no revenue, compared to a net loss of $1.17 million, or $0.10 per diluted share, on no revenue, for the same period in the prior year.

29.     In the press release, the Company stated, in part:

**Second Quarter 2011 Highlights:**

497206.1

- Submitted Design Dossier for (CRMD003) Neutrolin® as part of the European CE Mark Approval Process

- Special Protocol Assessment ("SPA") Agreement with FDA for Phase III Trial in Prevention of Contrast Induced Acute Kidney Injury ("CI-AKI") with (CRMD001), A Proprietary Formulation of Deferiprone

- Successfully Completed Patient Recruitment in Phase II CI-AKI with (CRMD001), A Proprietary Formulation of Deferiprone

**Planned Second Half 2011 Milestones:**

- Announce data from Phase II CI-AKI Study for (CRMD001), A Proprietary Formulation of Deferiprone

- Start Pivotal Phase III Clinical Study for (CRMD003) Neutrolin® Pending FDA Approval

Commenting on the quarter, John C. Houghton, the Company's President and Chief Executive Officer, remarked, "CorMedix has made significant progress during the second quarter of 2011.  We are very pleased to have successfully completed patient enrollment in our Phase II study of CRMD001, along with submitting our design dossier for CRMD003 as part of the European approval process.

30.     On August 9, 2011, the Company also filed a quarterly report on Form 10-Q with the SEC which was signed by Defendants Houghton and Lenz, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Houghton and Lenz, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

31.     On September 30, 2011, the Company issued a press release and filed a Form 8-K with the SEC, announcing that Defendant Houghton and the Company "have mutually agreed not to renew Mr. Houghton's employment agreement." Additionally, the press release stated that

"In the interim, Mr. Richard M. Cohen, a member of the Company's Board of Directors, will serve as the Company's Executive Chairman in a non-employee capacity."

32.     On November 10, 2011, the Company issued a press release and filed a Form 8-K with the SEC, announcing its financial and operating results for the third quarter ending September 30, 2011. The Company reported a net loss of $2.6 million, or $0.23 per diluted share, on no revenue, compared to a net loss of $1.39 million, or $0.12 per diluted share, on no revenue, for the same period in the prior year.

33.     In the press release, the Company stated, in part:

**Third Quarter 2011 Highlights:**

- Submitted Design Dossier for (CRMD003) Neutrolin® as part of the European CE mark approval process

- Announced appointment of Steven W. Lefkowitz to Board of Directors

- Announced amended agreement with Shvia Biomedial, LLC for (CRMD001), a proprietary formulation of deferiprone to revise and extend certain terms

- Announced FDA designation for (CRMD003) Neutrolin®

- Announced strategic changes to focus on CE marking approval and commercialization of (CRMD003) Neutrolin® in Europe

**Planned Second Half 2011 Milestones:**

- Complete stage 1 TUV audit for the CE marking approval process for (CRMD003) Neutrolin® in Europe

"CorMedix continued to make progress on the CE marking European approval process for Neutrolin® during the third quarter of 2011.  We look forward to providing an update by year end on the approval process and remain committed to securing a partner to commercialize and market Neutrolin® in Europe in 2012," commented, Richard M. Cohen, the Company's Executive Chairman and Interim Chief Executive Officer.

34.     On November 10, 2011, the Company also filed a quarterly report on Form 10-Q with the SEC which was signed by Defendants Cohen and Lenz, and reiterated the Company's

497206.1

previously announced quarterly financial results and financial position. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Cohen and Lenz, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

35.    On March 19, 2012, the Company issued a press release and filed a Form 8-K with the SEC, announcing its financial and operating results for the year ended December 31, 2011. The Company reported a net loss of $6.7 million, or $0.59 per diluted share, on no revenue, compared to a net loss of $10.9 million, or $1.15 per diluted share, on no revenue, for the year ended December 31, 2010.

36.    In the press release, the Company stated, in part:

**Fourth Quarter 2011 Developments:**

- Successfully completed stage 1 of 2 audits with TÜV America;

- Received approval for approximately $500K in non-dilutive funding through the sale of New Jersey tax losses.

Commenting on year-end results, CorMedix Chairman and Interim Chief Executive Officer, Richard M. Cohen, stated, "We are pleased with the progress we made during 2011 with CRMD003, Neutrolin® towards CE Marking approval, which is expected by the end of the first half of 2012. We continue to pursue discussions with potential partners and distributors as we expect to be in a position to launch CRMD003, Neutrolin® during 2012 for the prevention of catheter related bloodstream infections and maintenance of catheter patency in hemodialysis and non-dialysis patients in Europe by the end of 2012, subject to receiving CE Mark approval in Europe."

37.    On March 19, 2012, the Company also filed an annual report on Form 10-K with the SEC which was signed by Defendants Cohen and Lenz, and reiterated the Company's previously announced quarterly and fiscal year-end financial results and financial position. In addition, the 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002

497206.1

("SOX") by Defendants Cohen and Lenz, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

38.     On May 3, 2012, the Company issued a press release and filed a Form 8-K with the SEC, announcing the abrupt resignation of Defendant Lenz and announcing that Defendant Cohen, at that time the Interim CEO, would also become the Company's Interim CFO. Additionally, the Company announced the appointment of Defendant Milby as its Chief Operating Officer.

39.     On May 15, 2012, the Company filed a quarterly report on Form 10-Q with the SEC, signed by Defendant Cohen, announcing its financial and operating results for the first quarter ending March 31, 2012. The Company reported a net loss of $0.91 million, or $0.08 per diluted share, on no revenue, compared to a net loss of $1.98 million, or $0.17 per diluted share, on no revenue, for the same period in the prior year. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendant Cohen stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

40.     On August 13, 2012, the Company filed a quarterly report on Form 10-Q with the SEC, signed by Defendant Cohen, announcing its financial and operating results for the second quarter ending June 30, 2012. The Company reported a net loss of $0.62 million, or $0.05 per diluted share, on no revenue, compared to a net loss of $2.48 million, or $0.22 per diluted share, on no revenue, for the same period in the prior year. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendant Cohen stating

497206.1

that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

41.     On November 13, 2012, the Company filed a quarterly report on Form 10-Q with the SEC, signed by Defendant Cohen, announcing its financial and operating results for the third quarter ending September 30, 2012. The Company reported a net loss of $1.03 million, or $0.09 per diluted share, on no revenue, compared to a net loss of $2.608 million, or $0.23 per diluted share, on no revenue, for the same period in the prior year. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendant Cohen stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

42.     On December 24, 2012, the Company issued a press release and filed a Form 8-K with the SEC announcing changes to its executive team. In the press release, the Company stated, in part:

- Randy Milby has been promoted to Chief Executive Officer, effective January 1, 2013. Mr. Milby currently serves as Chief Operating Officer.

- Richard M. Cohen will serve as Chief Financial Officer, effective January 1, 2013, and will continue as Executive Chairman and director of CorMedix. Mr. Cohen currently is Interim Chief Financial Officer and Interim Chief Executive Officer.

43.     On March 27, 2013, the Company issued a press release and filed a Form 8-K with the SEC, announcing its financial and operating results for the year ended December 31, 2012. The Company reported a net loss of $3.38 million, or $0.30 per diluted share, on no revenue, compared to a net loss of $6.7 million, or $0.59 per diluted share, on no revenue, for the year ended December 31, 2011.

44.     In the press release, the Company sated, in part:

**Fourth Quarter 2012 and First Quarter 2013 Financing Developments:**

- Successfully raised approximately $500K through a private placement of convertible notes in November 2012, which was the second tranche of a financing that raised an aggregate of $1.32 million;

- Entered into a marketing agreement for Neutrolin® with MKM Co-Pharma GmbH in January 2013; and

- Raised $533,000 in gross proceeds from the sale to an existing institutional investor of shares of our Series A non-voting convertible preferred stock and related common stock warrants in February 2013.

Commenting on year-end results, CorMedix Chief Executive Officer, Randy Milby, stated, "We are pleased with the progress we made during 2012 with Neutrolin® towards CE Marking approval, which is expected by the end of the first half of 2013. We continue to plan with our marketing partner, MKM Co-Pharma GmbH, as well as seek additional partners and distributors, for the launch of Neutrolin® for the prevention of catheter related bloodstream infections and maintenance of catheter patency in hemodialysis and non-dialysis patients in Europe in 2013, subject to receiving CE Mark approval in Europe."

45.    On March 27, 2013, the Company also filed an annual report on Form 10-K with the SEC which was signed by Defendants Milby and Cohen, and reiterated the Company's previously announced quarterly and fiscal year-end financial results and financial position. In addition, the 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Milby and Cohen, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

46.    On May 15, 2013, the Company filed a quarterly report on Form 10-Q with the SEC, signed by Defendants Milby and Cohen, announcing its financial and operating results for the first quarter ending March 31, 2013. The Company reported a net loss of $1.25 million, or $0.13 per diluted share, on no revenue, compared to a net loss of $0.91 million, or $0.8 per diluted share, on no revenue, for the same period in the prior year. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by

14

Defendants Milby and Cohen stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

47.     On August 14, 2013, the Company issued a press release and filed a Form 8-K with the SEC, announcing its financial and operating results for the second quarter ending June 30, 2013. The Company reported a net loss of $1.95 million, or $0.15 per diluted share, on no revenue, compared to a net loss of $0.62 million, or $0.05 per diluted share, on no revenue, for the same period in the prior year.

48.     In the press release, the Company stated, in part:

BRIDGEWATER, N.J., Aug. 14, 2013 /PRNewswire/ -- CorMedix Inc. ("CorMedix") (NYSE MKT: CRMD), a pharmaceutical company focused on developing and commercializing therapeutic products for the prevention and treatment of cardiorenal disease, announces its financial results for the second quarter ended June 30, 2013. With the receipt in July 2013 of the CE Mark for Neutrolin®, CorMedix is now focused on commercializing Neutrolin in the European Union and rest of world. CorMedix estimates the market potential for Neutrolin to be between $300 - 400 million.

To help guide the company forward in this new commercial phase a number of management and board changes have been made including the appointment to the Board of Directors of Randy Milby, the company's CEO, the appointment of Gary A. Gelbfish as non-executive Chairman of the Board, the appointment of Dr. Antony E. Pfaffle as Vice-Chairman of the Board and Steven Lefkowitz as interim CFO. Richard Cohen, Executive Chairman of the Board and Chief Financial Officer, resigned from CorMedix to pursue his other business interests. "Rich has made significant contributions to CorMedix during his tenure as Executive Chairman of the Board, Acting CEO and CFO. He spearheaded the initiative to obtain the CE Mark and provided valuable leadership and guidance," said Randy Milby CEO. "I would like to express our appreciation and wish him success as he focuses his efforts on building Chord Advisors, his growing healthcare advisory business." The company believes that the above appointments will enable the company to advance on the commercial, financial, clinical and regulatory fronts.

CorMedix is in the process of evaluating strategic partnerships and funding opportunities, with a focus on non-dilutive transactions.

497206.1

**Planned Second Half 2013 Milestones:**

- Neutrolin sales in Germany

- Strategic partnerships for the commercialization of Neutrolin

- FDA pre-IND meeting for Neutrolin

- Successfully Completed Patient Recruitment in Phase II CI-AKI with (CRMD001), A Proprietary Formulation of Deferiprone

49.     On August 14, 2013, the Company also filed a quarterly report on Form 10-Q with the SEC which was signed by Defendants Milby and Cohen, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Milby and Cohen, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

50.     On November 19, 2013, the Company filed a quarterly report on Form 10-Q with the SEC, signed by Defendants Milby and Lefkowitz, announcing its financial and operating results for the third quarter ending September 30, 2013. The Company reported a net loss of $2.50 million, or $0.18 per diluted share, on no revenue, compared to a net loss of $1.03 million, or $0.09 per diluted share, on no revenue, for the same period in the prior year. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Milby and Lefkowitz stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

497206.1

51.     On December 12, 2013, the Company issued a press release and filed a Form 8-K

with the SEC announcing the first sale of Neutrolin® in the European Union. In the press

release, the Company stated, in part:

BRIDGEWATER, N.J., December 12, 2013 -- CorMedix Inc. (NYSE MKT: CRMD), a pharmaceutical company focused on developing and commercializing therapeutic products for the prevention and treatment of cardio-renal and infectious disease, today announced that it has received approval to commence sales of its Neutrolin® catheter lock solution in Germany from the Hessian District President. As previously disclosed, the Company has received orders from several dialysis centers and now has begun fulfilling these orders today.

"The final regulatory approval and official commercialization of Neutrolin is a noteworthy milestone for CorMedix and the culmination of several years of tireless work on the part of our team, both in the United States and Germany," said Randy Milby, Chief Executive Officer of CorMedix. "Our pre-commercial marketing efforts were strong, and we received encouraging feedback from both dialysis centers and private practice nephrologists which resulted in a number of orders. With this approval, we have begun shipping Neutrolin to the dialysis centers so their patients can begin receiving the benefits of this important therapy."

"The progression of our key strategic initiatives since receiving CE Mark approval for Neutrolin early in the second half of 2013 has CorMedix poised for strong growth as we enter the New Year. We believe that 2014 could be a transformational year for our Company as we continue working to grow the business in Europe, the Middle East and other geographies and create shareholder value," Milby said.

In conjunction with ongoing sales and marketing of Neutrolin in Germany, the Company's 2014 strategic plan includes expanding Neutrolin sales into other targeted EU countries and other markets. Additionally, CorMedix will pursue label expansion for Neutrolin beyond its primary indication of hemodialysis, oncology, ICU, total parenteral nutrition and peritoneal dialysis.

The Neutrolin solution, which received CE Mark approval as a Class III device, includes the standard of care concentration of an anti-coagulant and a highly potent, very broad-spectrum antimicrobial (antibacterial and antifungal) combination that is active against common microbes including antibiotic-resistant strains and inhibits the formation of biofilm. As a catheter lock solution, Neutrolin has been proven to significantly reduce the incidence of catheter related bloodstream infections (CRBIs) as well as maintain catheter patency by inhibiting thrombosis, reducing the need for systemic antibiotics and prolonging central venous catheter life.

52.     On January 10, 2014, the Company issued a press release and filed a Form 8-K with the SEC announcing that CorMedix was awarded a European Patent for Neutrolin. In the press release, the Company stated:

BRIDGEWATER, N.J., January 10, 2014 – CorMedix Inc. (NYSE MKT: CRMD), a pharmaceutical company focused on developing and commercializing therapeutic products for the prevention and treatment of cardio-renal and infectious disease, today announced that the European Patent Office ("EPO") has granted a European patent for a low heparin catheter lock solution for maintaining patency and preventing infection in a hemodialysis catheter (sometimes referred to as "the Prosl patent"). The Company is the exclusive worldwide licensee of European Patent EP 1 814 562 B1, which was granted on January 8, 2014.

"The issuance of the Prosl patent is a significant addition to our intellectual property portfolio in the EU," said Randy Milby, CorMedix Chief Executive Officer. "This patent will strengthen our ability to compete with other catheter lock solutions and help raise the standard of catheter care in Europe."

53.     On January 13, 2014, the Company issued a press release and filed a Form 8-K with the SEC announcing that CorMedix is expanding Neutrolin® Sales with Middle East Distribution Agreements. In the press release, the Company stated:

BRIDGEWATER, N.J., Jan. 13, 2014 – CorMedix Inc. (NYSE MKT: CRMD), a pharmaceutical company focused on developing and commercializing therapeutic products for the prevention and treatment of cardio-renal and infectious disease, today announced the establishment of letters of intent for the importation, sales, marketing and distribution of the Neutrolin catheter lock solution with two leading Middle East distributors, expanding the Company's sales presence to Oman, Yemen and Saudi Arabia.

The Company is working with two leading healthcare groups; taiba, in the Sultanate of Oman for Neutrolin distribution in Yemen and Oman and Arabian Trade House for distribution in Saudi Arabia.

More than 95,000 Middle Eastern patients currently receive hemodialysis. This population has been growing by 8 percent each year. Because Neutrolin could reduce infection rates by as much as 94 percent, the importance of incorporating the catheter lock solution into these patients' standard of care is clear.

"The letter of intent for these distribution agreements is the first step in expanding Neutrolin sales beyond the European Union," said Randy Milby, CorMedix chief executive officer. "The Middle East is an important strategic market for CorMedix and we believe business development agreements with these high

caliber organizations will enable us to make meaningful inroads in the region in 2014."

To further marketing and commercialization efforts in the European Union, Middle East and other countries that recognize the CE Mark, the CorMedix Board of Directors approved the establishment of a Sales and Marketing Oversight Committee.  The primary function of the committee is to provide expert input and guidance to the chief executive officer and to the sales and marketing teams as they continue to grow Neutrolin's global footprint.  CorMedix board member Matthew P. Duffy will chair the new committee.  Duffy has extensive pharmaceutical experience which includes most aspects of commercialization from early stage product development through the launch of several large marketed products, including Pfizer's Viagra, MedImmune, Inc.'s RespiGam, Synagis and CytoGam; and Lev Pharmaceuticals' (now ViroPharma, Inc.) Cinryze.  Mr. Duffy will review status and strategy of current and future marketing, distribution and sales initiatives.

54.     On March 31, 2014, the Company filed an annual report on Form 10-K with the SEC, signed by Defendants Milby and Lefkowitz, announcing its financial and operating results for the year ending December 31, 2013. The Company reported a net loss of $9.13 million, or $0.69 per diluted share, on revenue of $0.01 million, compared to a net loss of $3.38 million, or $0.30 per diluted share, on no revenue, for the year ending December 31, 2012. In addition, the 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Milby and Lefkowitz, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

55.     On May 15, 2014, the Company filed a quarterly report on Form 10-Q with the SEC, signed by Defendants Milby and Lefkowitz, announcing its financial and operating results for the first quarter ending March 31, 2014. The Company reported a net loss of $16.71 million, or $0.87 per diluted share, on revenue of $0.01 million, compared to a net loss of $1.25 million, or $0.13 per diluted share, on no revenue, for the same period in the prior year. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by

Defendants Milby and Lefkowitz stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

56.    On June 23, 2014, the Company issued a press release and filed a Form 8-K with the SEC announcing that it finalized a pivotal phase 3 study protocol for FDA. In the press release, the Company stated:

> BRIDGEWATER, N.J., June 23, 2014 -- CorMedix Inc. (NYSE MKT: CRMD), a pharmaceutical company focused on developing and commercializing therapeutic products for the prevention and treatment of cardiorenal and infectious disease, today announced the progress of on-going discussions with the U.S. Food and Drug Administration for a planned pivotal Phase 3 randomized controlled trial ("RCT") for Neutrolin® for use in hemodialysis patients with a central venous catheter.  CorMedix worked with the FDA to develop the protocol design for the planned trial for a marketing application.  Based on FDA input, the planned Phase 3 clinical trial will be a multi-center, randomized, controlled study conducted in the U.S. and Europe.  Dr. Michael Allon, Professor, Department of Medicine, Division of Nephrology, University of Alabama, Birmingham will be the Study Chair of the Neutrolin Phase 3 program.

> In addition, CorMedix has earlier submitted detailed information to TUV-SUD for the purpose of advancing our label expansion in the European Union to include oncology, total parenteral nutrition and intensive care patients.

> Randy Milby, Chief Executive Officer of CorMedix, stated, "The planned Neutrolin pivotal Phase 3 clinical trial is a major milestone which provides us with a clearly defined development and regulatory pathway for Neutrolin, and we would like to thank the FDA for its invaluable guidance throughout this process." "We believe that Neutrolin is well positioned to unlock significant shareholder value."

57.    On July 24, 2014, the Company issued a press release and filed a Form 8-K with the SEC announcing that it added executives to its management team. In the press release, the Company stated, in part:

> New Executives

> In addition, CorMedix announces the addition of two executives to the management team. Harry O'Grady joins the Company as Chief Financial Officer

20

and Dr. Antony Pfaffle transitions from Interim Chief Scientific Officer to a full time Chief Scientific Officer.

Randy Milby, Chief Executive Officer of CorMedix, stated, "The steps to regain compliance with the NYSE-MKT listing standards are well underway and we feel confident CorMedix will be in compliance by the end of the extension period. In addition, I am very pleased to welcome Harry O'Grady and Dr. Antony Pfaffle to full time positions on the CorMedix management team.  Harry brings an extensive hands-on operational financial skill set to the Company.  Dr. Pfaffle has been an instrumental figure within CorMedix and is leading the clinical development of Neutrolin. We are pleased to have them focused on the success of CorMedix."

58.     On August 14, 2014, the Company issued a press release and filed a Form 8-K with the SEC, announcing that the FDA Accepted the Company's "Pivotal Phase 3 Study Protocol," and announcing that the Company signed a business collaboration agreeement in South Korea with Wonik Corporation. In the press release, the Company stated, in part:

BRIDGEWATER, N.J., August 14, 2014 -- CorMedix Inc. (NYSE MKT: CRMD), a pharmaceutical company focused on developing and commercializing therapeutic products for the prevention and treatment of cardiorenal and infectious disease, today announced the U.S. Food and Drug Administration (FDA) has agreed with the design of our pivotal Phase III protocol for Neutrolin® in Hemodialysis patients, and the company plans to submit the IND for Neutrolin within the next 30 days. The FDA will then have 30 days to respond to the IND. The pivotal Phase 3 randomized controlled trial ("RCT") for Neutrolin is for use in hemodialysis patients with a central venous catheter.  The Phase 3 clinical trial will be a multi-center, randomized, controlled study conducted in the U.S. and Europe.  Dr. Michael Allon, Professor, Department of Medicine, Division of Nephrology, University of Alabama, Birmingham will be the Study Chair of the Neutrolin Phase 3 program.

In addition, CorMedix is pleased to announce strategic business collaboration with Wonik Corporation, a South Korean corporation with a strong medical device franchise within the Korean healthcare market.  Wonik has a strong medical franchise and we believe it is well positioned to market, sell and distribute Neutrolin for hemodialysis patients upon receipt of regulatory approval in Korea.

Randy Milby, Chief Executive Officer of CorMedix, stated, "I am very pleased to have signed a definitive agreement with an established commercial partner, Wonik Group in South Korea, a professional and growing healthcare company in one of the key markets in East Asia.  It will of course take some time to gain regulatory approval to market the product."

"In addition, the acceptance of the Neutrolin pivotal Phase 3 clinical trial protocol is a major milestone which provides us with a clearly defined development and regulatory pathway for Neutrolin in the United States, and we would like to thank the FDA for its continued guidance throughout this process.

59.     On August 14, 2014, the Company also filed a quarterly report on Form 10-Q with the SEC which was signed by Defendants Milby and O'Grady, announcing its financial and operating results for the second quarter ending June 30, 2014. The Company reported net income of $3.51 million, or a net loss per diluted share of $0.05, on revenue of $0.04 million, compared to a net loss of $1.95 million, or $0.15 per diluted share, on no revenue, for the same period in the prior year. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Milby and O'Grady, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

60.     On September 12, 2014, the Company filed a Form 8-K with the SEC.  In the Form 8-K, the Company stated in part:

On September 9, 2014, we filed in the Mannheim District Court (Germany) a patent infringement action against TauroPharm GmbH and Tauro-Implant GmbH as well as their respective CEOs (the "Defendants") claiming infringement of our European Patent EP 1 814 562 B1, which was granted by the European Patent Office on January 8, 2014 (the "Prosl Patent").  The Prosl patent covers a low heparin catheter lock solution for maintaining patency and preventing infection in a hemodialysis catheter.  In this action, we claim that the Defendants infringe on the Prosl Patent by manufacturing (TauroPharm GmbH and their CEOs only) and distributing catheter locking solutions to the extent they are covered by the claims of the Prosl Patent.  We believe that our patent is sound, and we are seeking injunctive relief and raising claims for information, rendering of accounts, calling back, destruction, compensation and damages.  However, we cannot predict what defenses the Defendants may raise or the ultimate outcome of this matter.  In addition, it may be that one or more of the Defendants may file an action challenging the validity of the Prosl Patent, which may take the form of a nullity suit before the German Patent Court or an opposition before the European Patent Office.

497206.1

61.     On September 22, 2014, the Company issued a press release and filed a Form 8-K

with the SEC announcing that the label expansion for Neutrolin was approved for the European

Union. In the press release the Company stated, in part:

> BRIDGEWATER, N.J., September 22, 2014 -- CorMedix Inc. (NYSE MKT: CRMD), a pharmaceutical company focused on developing and commercializing therapeutic products for the prevention and treatment of cardiorenal and infectious disease, today is pleased to announce that TUV-SUD and The Medicinal Evaluation Board of the Netherlands (MEB) has granted its request for a label expansion for Neutrolin, its catheter lock solution.   Neutrolin was initially approved in July 2013 for use in the prevention of catheter-related bloodstream infections (CRBI) and maintenance of catheter patency in hemodialysis patients using a tunneled, cuffed central venous catheter for vascular access.

> The label expansion includes approval for additional indications for use in oncology patients receiving chemotherapy, IV hydration and IV medications via central venous catheters. The expansion also includes patients receiving medication and IV fluids via central venous catheters in intensive or critical care units (cardiac care unit, surgical care unit, neonatal critical care unit, and urgent care centers). An indication for use in total parenteral nutrition was also approved.

> The company believes that the label expansion will enable additional critically ill patients to benefit from the expanded use of Neutrolin to prevent infection and thrombosis. The active anti-infective ingredient in Neutrolin is taurolidine, which has efficacy against both common and resistant forms of bacteria and fungi. Despite a long history of clinical use, development of resistance has not been observed.

> Randy Milby, Chief Executive Officer and Dr. Antony Pfaffle, Chief Scientific Officer of CorMedix, stated, "We are very pleased with the label expansion and the extended ability to treat patients with urgent medical needs. We thank the regulatory authorities and our regulatory advisors for their cooperation in achieving this significant milestone."

62.     On September 25, 2014, the Company issued a press release and filed a Form 8-K

with the SEC announcing that it filed with the FDA an IND Filing for Neutrolin in the United

States. In the   press release, the Company stated, in part:

> BRIDGEWATER, N.J., September 25, 2014 -- CorMedix Inc. (NYSE MKT: CRMD), a pharmaceutical company focused on developing and commercializing therapeutic products for the prevention and treatment of cardiac, renal and infectious disease,  is pleased to announce that an Investigational New Drug

application (IND)  for Neutrolin® was submitted to the United States Food and Drug Administration (FDA) on Wednesday, September 24, 2014.

The IND includes a pivotal Phase 3 protocol for Neutrolin® in hemodialysis patients with a central venous catheter.  The Phase 3 clinical trial is designed as a multi-center, randomized, controlled study conducted in the U.S. and Europe.  Dr. Michael Allon, Professor, Department of Medicine, Division of Nephrology, University of Alabama, Birmingham will be the Study Chair of the Neutrolin® Phase 3 program. An IND goes into effect 30 days after FDA receives the IND, unless FDA provides notification that the IND is subject to a clinical hold.

Dr. Antony Pfaffle, Chief Scientific Officer at CorMedix stated, "The filing of our IND is an important incremental step that we believe will lead to the availability of Neutrolin® for patients in the US with central venous catheters. Neutrolin® is being developed to help prevent catheter-related infections and thrombosis. The active anti-infective ingredient in Neutrolin® is taurolidine, which has efficacy against both common and resistant forms of bacteria and fungi. Use of taurolidine has not been associated with the development of microbial resistance in humans."

Randy Milby, CEO of CorMedix would like to thank all the members of the regulatory team, and the scientific advisors who have helped prepare the IND, and wishes to express the company's appreciation to the FDA for its continued guidance in this important regulatory milestone for CorMedix.

Recently CorMedix reported the receipt of  a broad label expansion in the entire European Union to include not only hemodialysis catheters, but also catheters used in chemotherapy, total parenteral nutrition and critical care settings. CorMedix is proud to continue to support Neutrolin® development and hopes to gain FDA approval to introduce the product in the US to prevent catheter-related infections and thrombosis.

63.    On October 27, 2014, the Company issued a press release and filed a Form 8-K

with the SEC announcing that it received approval from FDA to initiate a clinical trial for

Neutrolin in the US. In the press release, the Company stated, in part:

BRIDGEWATER, N.J., October 24, 2014 -- CorMedix Inc. (NYSE MKT: CRMD) is pleased to announce today that the United States Food and Drug Administration (FDA) has reviewed its Investigational New Drug application (IND) for Neutrolin® which was submitted September 24, 2014, and determined that the IND is not subject to a clinical hold, and that a pivotal clinical study can be initiated in the United States. CorMedix is a pharmaceutical company focused on developing and commercializing therapeutic products for the prevention and treatment of cardiac, renal and infectious diseases.

The IND includes a pivotal Phase 3 protocol for Neutrolin® in hemodialysis patients with a central venous catheter. The Phase 3 clinical trial will be a multi-center, randomized, controlled study conducted in the U.S. and Europe. Dr. Michael Allon, Professor, Department of Medicine, Division of Nephrology, University of Alabama, Birmingham will be the Study Chair of the Neutrolin Phase 3 program.

Randy Milby, CEO of CorMedix would like to thank all the members of the regulatory team, and the scientific advisors who helped prepare the IND, and wishes to express the company's appreciation to the FDA for its continued guidance in this important regulatory milestone for CorMedix.

Dr. Antony Pfaffle, Chief Scientific Officer at CorMedix stated, "The approval to initiate our pivotal clinical trial is an exciting development that we hope will lead to the availability of Neutrolin® for patients in the United States with central venous catheters. Neutrolin® is being developed to help prevent catheter-related infections and thrombosis. The active anti-infective ingredient in Neutrolin® is taurolidine, which has efficacy against both common and resistant forms of bacteria and fungi. Use of taurolidine has not been associated with the development of microbial resistance in humans."

CorMedix is currently developing an additional Phase 3 protocol to support the use of Neutrolin® to prevent catheter related infections for oncology patients receiving total parenteral nutrition.

64.     On November 13, 2014, the Company filed a quarterly report on Form 10-Q with the SEC, signed by Defendants Milby and O'Grady, announcing its financial and operating results for the third quarter ending September 30, 2014. The Company reported a net loss of $5.04 million, or $0.23 per diluted share, on revenue of $0.05 million, compared to a net loss of $2.50 million, or $0.18 per diluted share, on no revenue, for the same period in the prior year. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Milby and O'Grady stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

497206.1

65.     On December 3, 2014, the Company issued a press release and filed a Form 8-K

with the SEC announcing that the label expansion for Neutrolin was approved in Germany. In

the press release, the Company stated:

> BRIDGEWATER, N.J., December 3, 2014 -- CorMedix Inc. (NYSE MKT:
> CRMD), a pharmaceutical company focused on developing and commercializing
> therapeutic products for the prevention and treatment of cardiac, renal and
> infectious disease, announced today the approval of a label expansion from the
> Hessian District President in Germany for its lead product Neutrolin®, a catheter
> lock solution.
>
> Neutrolin was initially approved in Germany in December 2013 for use in the
> prevention of catheter-related bloodstream infections (CRBI) and maintenance of
> catheter patency in hemodialysis patients using a tunneled, cuffed central venous
> catheter for vascular access. This approval expands the label to include use in
> oncology patients receiving chemotherapy, IV hydration and IV medications via
> central venous catheters. The expansion also adds patients receiving medication
> and IV fluids via central venous catheters in intensive or critical care units
> (cardiac care unit, surgical care unit, neonatal critical care unit, and urgent care
> centers). An indication for use in total parenteral, or IV, nutrition was also
> approved.
>
> In September 2014, the TUV-SUD and The Medicinal Evaluation Board of the
> Netherlands (MEB) granted a label expansion for Neutrolin for these same
> expanded indications for the EU. The active anti-infective ingredient in Neutrolin
> is taurolidine, which has efficacy against both common and resistant forms of
> bacteria and fungi. Despite a long history of clinical use, development of
> resistance has not been observed.
>
> "With these label expansions, more highly vulnerable patients in the critical care,
> oncology and dialysis settings can be treated with Neutrolin for the prevention of
> infection and thrombosis," said Dr. Antony Pfaffle, Chief Scientific Officer of
> CorMedix. "Our goal is to provide the optimal catheter care solution to improve
> the quality of clinical medical care for these patients."

66.     On December 4, 2014, the Company issued a press release and filed a Form 8-K

with the SEC, announcing that it filed a request with FDA for QIDP Designation for Neutrolin.

In the press release, the Company stated, in part:

> BRIDGEWATER, N.J., December 4, 2014 -- CorMedix Inc. (NYSE MKT:
> CRMD), a pharmaceutical company focused on developing and commercializing
> therapeutic products for the prevention and treatment of cardiac, renal and
> infectious disease, has filed a request with the U.S. Food and Drug Administration

(FDA) for designation of its lead product candidate, Neutrolin® Catheter Lock Solution, as a qualified infectious disease product (QIDP) pursuant to the Generating Antibiotic Incentives Now (GAIN) title of the Food and Drug Administration Safety and Innovation Act (FDASIA).   Neutrolin contains taurolidine, which has been shown to be a potent anti-infective agent that is active against gram positive and gram negative bacteria, and also contains heparin to ensure patency of the catheter. Dr. Douglas Webb, an infectious disease expert and a member of the CorMedix Scientific Advisory Board, noted that "GAIN is intended to encourage development of new antibacterial and antifungal drugs to address serious and life-threatening infections. Neutrolin has shown antimicrobial activity against several of the qualifying pathogens that FDA has designated for GAIN and that are documented to be a serious threat to public health by causing blood-stream infections in hemodialysis patients, including Staphylococcus aureus, Pseudomonas species, and Enterococcus species."

CorMedix is requesting designation of Neutrolin as a QIDP to secure incentives, such as the 5 year extension of marketing exclusivity, for pursuing marketing approval in the U.S. CorMedix intends to conduct clinical trials with Neutrolin® Catheter Lock Solution in hemodialysis patients and oncology patients, where catheter-related blood stream infections can be life-threatening and infection of catheters with antibiotic resistant bacteria can result in catheter removal.

"We believe Neutrolin is a good candidate for this important designation, especially when development of resistance by microbial pathogens to taurolidine has not been demonstrated," said Randy Milby, CorMedix Chief Executive Officer.

The request for QIDP designation follows the request for Fast Track designation, submitted to FDA in November. Fast Track designation is intended to facilitate the development and expedite the review of drugs to treat serious conditions and fill an unmet medical need. CorMedix believes that Fast Track designation would be beneficial for the rapid development of Neutrolin in the U.S. to expand beyond its current use in Europe.

67.     On December 23, 2014, the Company issued a press release and filed a Form 8-K

with the SEC, announcing that it finalized its first Middle East sales/distribution agreement for

Neutrolin in the Kingdom of Saudi Arabia. In the press release, the Company stated, in part:

BRIDGEWATER, N.J., December 23, 2014 -- CorMedix Inc. (NYSE MKT: CRMD), a pharmaceutical company focused on developing and commercializing therapeutic products for the prevention and treatment of cardiac, renal and infectious disease, announced today the first signed Middle East sales/distribution agreement for lead product Neutrolin with distributor Arabian Trade House in the Kingdom of Saudi Arabia.

27

Saudi Arabia is the largest of the six Gulf Cooperation Council (GCC) countries made up of Bahrain, Kuwait, Oman, Qatar, Saudi Arabia and United Arab Emirates.  Saudi Arabia has approximately 13,000 patients on hemodialysis; with central venous catheter (CVC) usage rate are as high as 40 percent.  In Saudi Arabia, intensive care units (ICU), there are an estimated 1.6 million patients per year on catheters and an estimated 3,000 oncology patients with catheters.

CorMedix's Neutrolin is a novel formulation of taurolidine, citrate and heparin with1000 u/ml that provides a combination preventative solution, decreases the triple threat of infection, thrombosis, and biofilm to keep catheter's operating safely and efficiently by optimizing catheter blood flow while minimizing infections and biofilm formation.

"We are pleased to make Neutrolin available in Saudi Arabia to help the many patients with catheters in the dialysis setting who need new options for the prevention of infection and thrombosis," said Randy Milby, CEO of CorMedix. "This agreement extends our commercial reach into the Middle East and is creating a new revenue stream for the company."

68.   On January 15, 2015, the Company issued a press release and filed a Form 8-K

with the SEC announcing that it received Fast Track Designation for Neutrolin from the FDA. In

the press release, the Company stated, in part:

BRIDGEWATER, N.J., January 15, 2015 -- CorMedix Inc. (NYSE MKT: CRMD), a specialty pharmaceutical company focused on developing and commercializing therapeutic products for the prevention and treatment of cardiac, renal and infectious disease, is pleased to announce that the U.S. Food and Drug Administration (FDA) granted its request for Fast Track designation of its lead product candidate, Neutrolin® Catheter Lock Solution, pursuant to the Food and Drug Administration Safety and Innovation Act (FDASIA).  CorMedix's Neutrolin is a novel formulation of taurolidine, citrate and heparin with1000 u/ml that provides a combination preventative solution, decreases the triple threat of infection, thrombosis, and biofilm to keep catheter's operating safely and efficiently by optimizing catheter blood flow while minimizing infections and biofilm formation.

Fast Track designation is granted to drug products designed to treat a serious condition, for which have clinical data has been generated and shown to potentially address an unmet medical need.  The Fast Track designation of Neutrolin provides CorMedix with the opportunity to meet with the FDA on a more frequent basis during the review process, and also ensures an expedited review of any marketing application.  Neutrolin has shown antimicrobial activity against many of the pathogens that are known to pose a serious threat to public health by causing blood-stream infections in ICU, oncology and hemodialysis patients. CorMedix intends to expand on the previously collected clinical data by

conducting clinical trials with Neutrolin® Catheter Lock Solution in oncology, hemodialysis and intensive care unit patients, where catheter-related blood stream infections and clotting can be life-threatening.

"CorMedix is thrilled with this development." said Randy Milby, CorMedix Chief Executive Officer. "We believe that this designation will be invaluable as we seek to rapidly develop Neutrolin® for the U.S. central venous catheter patients, and address a critical medical need in the oncology, intensive care communities."

The request for Fast Track designation was followed by a December 2014 submission to the FDA requesting Neutrolin be designated a Qualified Infectious Disease Product (QIDP).  Designation of Neutrolin as a QIDP could secure incentives, such as the 5 year extension of marketing exclusivity, for pursuing marketing approval in the U.S.

69.    On January 20, 2015, the Company filed a Form 8-K with the SEC announcing

that it filed a complaint against TauroPharm GmbH and its managing directors in the District

Court of Cologne, Germany. In the Form 8-K, the Company stated, in part:

On January 16, 2015, CorMedix Inc. filed a complaint against TauroPharm GmbH and its managing directors in the District Court of Cologne, Germany.  In the complaint, CorMedix alleges violation of the German Unfair Competition Act by TauroPharm for the unauthorized use of CorMedix's proprietary information obtained in confidence by TauroPharm. CorMedix alleges that TauroPharm is improperly and unfairly using CorMedix's proprietary information relating to the composition and manufacture of CorMedix's lead product candidate in the United States, Neutrolin®, which is approved for sale in Germany, in its manufacture and sale of TauroPharm's products TauroLock ™ , TauroLock-HEP100 ™ and TauroLock-HEP500 ™ .  CorMedix seeks a cease and desist order against TauroPharm from continuing to manufacture and sell any product containing taurolidine as well as citric acid in addition to possible other components, damages for any sales in the past and the removal of all such products from the market.

70.    On January 29, 2015, the Company issued a press release and filed a Form 8-K

with the SEC announcing that the FDA granted QIDP Designation to Neutrolin. In the press

release, the Company stated, in part:

BRIDGEWATER, N.J., January 29, 2015 -- CorMedix Inc. (NYSE MKT: CRMD), a pharmaceutical company focused on developing and commercializing therapeutic products for the prevention and treatment of cardiac, renal and infectious diseases, today announced that the U.S. Food and Drug Administration (FDA) has designated the company's lead product candidate, Neutrolin® Catheter

Lock Solution, as a Qualified Infectious Disease Product (QIDP) for oncology, hemodialysis and intensive care unit patients, where catheter-related blood stream infections and clotting can be life-threatening.

The QIDP designation will make Neutrolin eligible to benefit from certain incentives as provided under the Generating Antibiotic Incentives Now (GAIN) program. These incentives include FDA priority review, eligibility for fast-track status and, if ultimately approved by the FDA, Neutrolin would be eligible for an additional five-year extension of Hatch-Waxman patent exclusivity.

Neutrolin is a novel formulation of taurolidine, citrate and heparin 1000 u/ml that provides a combination preventative solution, decreases the triple threat of infection, thrombosis and biofilm to keep catheters operating safely and efficiently by optimizing catheter blood flow while minimizing infections and biofilm formation.  Neutrolin has CE mark approval for use in the European Union and was recently approved to enter a planned Phase 3 program in the United States.

"CorMedix is delighted that the FDA has given Neutrolin a QIDP designation further affirming the importance of addressing the serious medical need related to catheter infections," said Randy Milby, CorMedix Chief Executive Officer. "The QIDP designation, combined with the recently achieved Fast Track designation, will strongly support our goal to bring Neutrolin® to the U.S. market as fast as possible."

In order to achieve QIDP designation, a drug product must be intended to treat serious or life-threatening infections, particularly those infections caused by "qualified pathogens," as determined by the FDA.  These pathogens include Staphylococcus aureus, Streptococcus species and Pseudomonas species, among others.  Neutrolin has shown antimicrobial activity against many of these qualified pathogens, several of which are known to pose a serious threat to the public health by causing blood-stream infections in hemodialysis, oncology, and intensive care patients.

Neutrolin's QIDP status follows its receipt of Fast Track designation, granted earlier this month.  Neutrolin's Fast Track designation provides CorMedix with the opportunity to meet with the FDA on a more frequent basis during the review process, and provides eligibility for priority review of the marketing application.

71.    On March 12, 2015, the Company filed an annual report on Form 10-K with the

SEC, signed by Defendants Milby and O'Grady, announcing its financial and operating results

for the year ending December 31, 2014. The Company reported a net loss of $20.45 million, or

$0.96 per diluted share, on revenue of $0.19 million, compared to a net loss of $9.13 million, or

$0.69 per diluted share, on revenue of $0.01 million, for the year ending December 31, 2013. In addition, the 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Milby and O'Grady stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

72.    On May 7, 2015, the Company filed a quarterly report on Form 10-Q with the SEC, signed by Defendants Milby and O'Grady, announcing its financial and operating results for the first quarter ending March 31, 2014. The Company reported a net loss of $5.50 million, or $0.23 per diluted share, on revenue of $0.03 million, compared to a net loss of $16.71 million, or $0.87 per diluted share, on revenue of $0.01 million, for the same period in the prior year. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Milby and O'Grady stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

73.    On May 19, 2015, the Company filed a Form 8-K with the SEC providing an update to the Company's patent litigation in Germany. In the Form 8-K, the Company stated, in part:

> CorMedix Inc. announces that it has now received written copies of the May 8, 2015 decisions of the District Court of Mannheim on CorMedix's patent and utility model infringement cases in Germany related to Neutrolin®. CorMedix previously announced the decisions of the Court on its investor conference call on May 8, 2015.
>
> The Court's written decisions confirm that the two proceedings brought by CorMedix against the German company TauroPharm GmbH and several of the founders and affiliates of TauroPharm have been stayed. In its decisions the Court found that the commercialization by TauroPharm in Germany of its TauroLock catheter lock solutions Hep100 and Hep500 infringes both CorMedix's patent and utility model and further that there is no prior use right that would allow TauroPharm to continue to make, use or sell its product in Germany. However,

the Court declined to issue an injunction in favor of CorMedix that would preclude the continued commercialization by TauroPharm based upon its finding that there is a sufficient likelihood that the European Patent Office (EPO), in the case of the patent, or the German Patent and Trademark Office (PTO), in the case of the utility model, may find that such patent or utility model is invalid. Specifically, the Court noted the possible publication of certain instructions for product use that may be deemed to constitute prior art. As such, under the standards established by German law, the District Court will defer any consideration of the request by CorMedix for injunctive and other relief until such time as the EPO or the German PTO has ruled on the underlying validity of the patent/utility model. CorMedix continues to believe that the aforementioned instructions do not, in fact, constitute prior art and that the patent and the utility model validly claims inventions that will be found to be such by the EPO and the German PTO; however, there can be no assurance that CorMedix will prevail.

As previously reported on January 16, 2015, CorMedix filed a complaint against TauroPharm and its managing directors in the District Court of Cologne, Germany. In the complaint, CorMedix alleges violation of the German Unfair Competition Act by TauroPharm for the unauthorized use of CorMedix's proprietary information obtained in confidence by TauroPharm. CorMedix alleges that TauroPharm is improperly and unfairly using CorMedix's proprietary information relating to the composition and manufacture of CorMedix's lead product candidate in the United States, Neutrolin, which is approved for sale in Germany, in its manufacture and sale of TauroPharm's products TauroLock TM , TauroLock-HEP100 TM and TauroLock-HEP500 TM . CorMedix seeks a cease and desist order against TauroPharm from continuing to manufacture and sell any product containing taurolidine as well as citric acid in addition to possible other components, damages for any sales in the past and the removal of all such products from the market. As previously reported, a hearing in this matter has been scheduled in the District Court of Cologne for July 2, 2015.

74.     On June 17, 2015, the Company issued a press release and filed a Form 8-K with the SEC announcing that the FDA had provided positive feedback for Neutrolin clinical trial protocol for oncology patients. In the press release, the Company stated, in part:

BEDMINSTER, N.J., June 17, 2015 -- CorMedix Inc. (NYSE MKT: CRMD), a biopharmaceutical company focused on developing and commercializing therapeutic products for the prevention and treatment of cardiac, renal and infectious disease, today announced that the U.S. Food and Drug Administration (FDA) has provided positive feedback regarding a second pivotal clinical trial protocol. The new Phase 3 protocol is designed to assess the use of Neutrolin® as a catheter lock solution in oncology patients who require total parenteral nutrition (TPN) to support filing of a New Drug Application with the FDA. The comments provided by the FDA should enhance the quality of the proposed study.

Neutrolin has shown antimicrobial activity against many of the pathogens that result in catheter related bloodstream infections in the oncology community. Infections pose a significant risk for oncology patients, many of whom require the long-term use of central venous catheters. CorMedix hopes that the use of Neutrolin in this susceptible population will help address a critical unmet medical need. Previously, the FDA reviewed the pivotal Phase 3 clinical trial protocol to evaluate the use of Neutrolin in hemodialysis patients, and preparations are underway to initiate the trial subject to identification of funding or strategic partnering.

"CorMedix is thankful for the valuable feedback provided by the FDA, and we are encouraged by their continued enthusiasm and support of Neutrolin," said Randy Milby, CorMedix Chief Executive Officer. "We are optimistic that this trial will further our efforts to bring Neutrolin to market in the United States so that more patients can benefit from its use."

Neutrolin received QIDP and Fast Track designations earlier this year. These designations provide CorMedix with the opportunity to meet with the FDA on a more frequent basis during the review process, and provide eligibility for priority review of the marketing application.

75.    The statements referenced in ¶¶ 22-30, 32-37, 39-41, 43-56, and 58-74 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, including that: (1) CorMedix's announcements regarding its partnership discussions and imminent Phase 3 trials for its sole product, Neutrolin, were materially false and misleading;  (2) clinical studies touted by CorMedix were misleading and overstated  Neutrolin's effectiveness when in fact Neutrolin offers no benefit compared to current industry protocols; (3) CorMedix overstated the cost effectiveness of Neutrolin compared to currently established medical protocols; (4) CorMedix's market claims for Neutrolin were overstated; (5) CorMedix stock achieved an unsustainable valuation by using paid stock promoters, yet failed to disclose the use of such promoters in its regulatory filings pursuant to Section 17(b) of the Securities Act of 1933; (6) CorMedix insiders enriched themselves at the expense of shareholders by selling stock

at inflated prices; and (7) as a result of the foregoing, CorMedix's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

76.    On June 29, 2015, an article was published on *SeekingAlpha.com* written by *The Pump Stopper*, reporting, alleging that:

> **CRMD Claims To Address An Issue That Already Has Countless, Effective And Cheap Solutions In Use**
>
> Unsophisticated CRMD shareholders mistakenly believe "There is nothing on the U.S. market that addresses this grave problem" when in fact catheters have been in use for over 100 years, and infections have always been an issue the medical community has addressed. To think doctors around the world have just been sitting by idly while their patients die for 100+ years is obviously absurd.
>
> The truth is there are literally countless solutions put in practice as standard protocol at hospitals around the world. These solutions are effective, easy to administer, safe and use a combination of common generic drugs that are so cheap as to be essentially free. Among these solutions are BOTH antibiotic and many non-antibiotic compounds proven to be effective and cheap. These are all recommended by CDC and other recognized disease protocol experts, and have been used effectively for many decades.
>
> *          *          *
>
> Despite what CRMD may claim, there are dozens of antibiotics hospitals have at their disposal should any one infection build resistance to any other antibiotic. This is why they these protocols have been effectively used for countless decades on tens of millions of people globally. Including aminoglycosides, beta-lactams, fluoroquinolones, folate antagonists, glycopeptides, glycylcyclines, lipopeptides, oxazolidinones, polymyxins, and tetracyclines, ethylenediaminetetraacetic acid, citrate, isopropyl alcohol, HCl acid, urokinase and countless other catheter lock protocols. To claim there is no solution available for CRBI is beyond absurd and even just 1 minute of Google research proves that.
>
> **Clinical Studies Show CRMD Product Offers *No Benefit* Vs. Current Industry Protocols**
>
> Unfortunately, for CRMD, clinical studies show Taurolidine catheter locks are just not more effective than what is currently being used while both obviously show benefits vs. heparin placebo:
>
> > "Gentamicin/heparin and taurolidine/citrate, used for locking UC, were ***similarly effective*** at preventing CRB and catheter thrombosis for up to 3

34

months, ***until a functional permanent vascular access became available***. ***Both antimicrobial lock solutions were superior to heparin*** in CRB prevention with similar thrombosis rates."[1]

When CRMD's Neutrolin is compared against the current industry standard, it seems to obviously offer no benefit. Furthermore, there are special products which hospitals have had for years to address any unusual infection they come across:

> "Several agents that may be used for *resistant* gram-positive infections including daptomycin, linezolid, and tigecycline have been studied."[2]

*    *    *

**CRMD's Misleading Neutrolin Presentations**

As you now know, a simple heparin catheter lock is NOT the standard for infection treatment and CRMD's comparison and proposed Phase3 trial against this irrelevant benchmark seems very misleading to me. In fact, multiple medical studies show Taurolidine lock is functionally identical to the currently established protocol and is absolutely NOT "40% better!" than what is currently in use. In light of the above, CRMD's direct statement of "no approved catheter lock solution" seems blatantly incorrect to me. If CRMD's Phase3 trial was properly constructed and CRMD forced to compare its worthless Taurolidine solution against what doctors *actually* use for catheter infections, medical studies show there would be essentially no advantage and CRMD would fail.

First of all, heparin has no antimicrobial or anti-infection prevention, so using that as the baseline is like comparing Neutrolin to a placebo. With cancer trials we don't test oncology products against Skittles or water, so why does that make sense here? Even more upsetting, putting trial patients at unnecessary risk of death when the opposing study arm should be receiving industry standard infection protocols seems irresponsible and dangerous in my view.

*    *    *

**Current Catheter Lock Protocols Penetrate Biofilms "Rapidly" And "Completely"**

The other bull case for CRMD revolving around biofilms is equally absurd as the current, nearly-free and commonly used protocols already address this as well.

*    *    *

---

[1] http://www.ncbi.nlm.nih.gov/pubmed/21372561
[2] http://www.ncbi.nlm.nih.gov/pmc/articles/PMC4271721/

497206.1

It's not just the standard antibiotics in use though that penetrate biofilms effectively as there is a multitude of other *non-antibiotic* protocols *already in use* for years which effectively deal with biofilms and simultaneously offer synergistic effects with the current antibiotic protocols as well:

> "The antimicrobial effect of potential additives, such as ion chelators *like ethylenediaminetetraacetic acid (EDTA)* and citrate, should also be considered. Such agents have been shown to disrupt biofilm and *exhibit synergistic activity with antibiotics*."[3]

### Many Cheap Non-Antibiotic Solutions Are Superior To CRMD As Well

CRMD touts claim Neutrolin is unique in that it's not an antibiotic, but there are already many cheap non-antibiotic catheter lock protocols being used around the world that Neutrolin cannot compete with.

Some doctors even advocate a simply hydrochloric acid lock as well, which is virtually free and:

> "significantly reduced the need to remove and replace CVCs. The procedure is practical, appears to be safe, and may reduce the consumption of antibiotics"[4]

While this very simple non-antibiotic also alternatively generated 70.7% lower catheter infection rates over a study including ~50k catheter days.

### Clinical Studies On Taurolidine/Neutrolin Seemingly Contradict CRMD's Efficacy Claims

To pretend medical consensus on Taurolidine is unanimous is misleading also. There are multiple clinical trials and medical though leaders who consider use of Taurolidine to be controversial and not beneficial. This adds an additional layer of risk, and I believe is another reason, despite being around for 40 years, Taurolidine has never gained acceptance.

*            *            *

### Neutrolin Not Even Vaguely Cost Effective Vs. Currently Established Medical Protocols

Probably the most important reason CRMD's old Taurolidine compound is not viable is because it will just never be cost competitive against what doctors are already using. Even if CRMD somehow avoided bankruptcy, made it through all regulatory hurdles and was on the market, it would still be totally financially unviable and worthless.

---

[3] http://www.ncbi.nlm.nih.gov/pmc/articles/PMC4271721/
[4] http://www.ncbi.nlm.nih.gov/pubmed/22992112

497206.1

For example, a typical catheter lock solution will use 0.5ml of 20mg/ml Gentamicin, 5,000iu of heparin and some sodium chloride (saline water). Gentamicin has been generic forever and so a typical 100mg/ml, 100ml bottle costs just ~$20. If you add up these ingredients, you can see the typical catheter lock protocol costs a maximum of $6-7 and most likely much less.

| CRMD/Neutrolin Has *No Chance of Competing* Against The Current *Established Medical Protocol* | | | | | | |
|---|---|---|---|---|---|---|
| Estimated Cost of Typical Gentamicin Catheter Lock Solution | | | | | | |
| | mg or iu/ml | cost | $/mg or iu | Mg Per Dose Used | Cost Per Dose | % of Total Cost |
| Genatimicin | 100 | $ 22.00 | $ 0.0022 | 5 | $ 0.01 | 0.16% |
| Heparin | 150,000 | $ 202.80 | $ 0.00 | 5,000 | $ 6.76 | 99.84% |
| Sodium Chloride | essentially free | | | | $ - | 0.00% |
| Total Cost of Typical Gentamicin Catheter Lock ---> | | | | | $ 6.77 | |

The numbers I've used here assume both unusually high heparin dosage and zero bulk purchase discount as well, which any hospital will certainly have. As evidence of the true cost of your average catheter lock infection prevention protocol check, this Middle East quote stating $2.50 per lock is typical.

* Assuming that the lock solution costs $2.50/session (→156 sessions/y), the total cost of the lock solution would be ~$400/pt/year.

All the ridiculous Roth, Griffin, etc. models using a $20-30+ price per lock application cost are clearly absurd, and I think there is no chance CRMD could ever make any profit at these prices. The currently established medical protocols used generic compounds that are so cheap as to be essentially free and the bulk of the current cost is in the heparin anyway, which CRMD's Neutrolin has and therefore has no advantage. There is just no chance Taurolidine with all its risks, doctor perceived uncertainty and cost can ever hope to compete with what doctors are currently doing when it is infinitely more expensive. Remember from above Taurolidine locks show are "similarly effective" at best to current protocols. To convince a cash strapped hospital or health insurance provider, they need to increase their cost by 10,000% to solve a problem they already have countless solutions for, is obviously unviable. In fact, it's laughable.

**CRMD's Phase3 Trial: Far From Assured**

Another demonstrably false claim by CRMD touts is that somehow the company's Phase3 trial is a "sure thing." As we have seen above, when CRMD's Neutrolin is compared against current industry standard, it is demonstrably *not superior* as the medical community has already made these comparisons over decades. We also know CRMD does not appear to be proposing any carcinogen studies despite that known concern. There are countless drugs in use in Europe that are not allowed in the U.S. and simply extrapolating European usage to mean U.S. success is assured is clearly ridiculous.

37

I think all of the above along with the Phase3 trial is why Elliot is desperately trying to jettison this failed investment now before the Phase3 trial or product market failure become undeniable, otherwise why not wait for the theoretically huge upside? Clearly, this question answers itself.

**CRMD Market Claims Far Overstated: German Corporate Records Show Tauropharm ~$1.3m Business**

Tauropharm was spun out of CRMD predecessor BioLink and has been selling a product functionally identical to CRMD's Neutrolin for 12 years into international markets. Tauropharm offers four Taurolidine products in the European market: two without heparin and then in 2007 Tauropharm launched two more products with heparin since some customers were adding their own heparin independently.

Due to essentially identical products, we can use Tauropharm for a useful proxy for Taurolidine/CRMD's international market opportunity. Furthermore, since CRMD has said the two markets are similar in size, we can also use Tauropharm as an indication of how Neutrolin would do in the U.S.

\*       \*       \*

With so many questions about the size of the European markets and Tauropharm, you'd think someone would just go and pull Tauropharm's German corporate records, which is cheap and easy …. I did this and am happy to share the results with you to help you understand why CRMD repeatedly refuses to provide any discussion of Tauropharm's financials on CRMD investor calls: Because the results are abysmal.

Tauropharm has <10 employees (I estimate 3) and has been around for 15 years, yet its CUMULATIVE earnings are just ~$3.61m euros. That is not a typo.

2012 was a record year for Tauropharm, which took over a decade to build to, and yet Tauropharm generated <1m euro, while the previous year it made 57,000 euro (no, I didn't forget any zeros).

\*       \*       \*

Any way you cut it, despite 15 years of effort, Tauropharm isn't a success. You should also note CRMD claims, in a best case outcome, it would only have a *Maximum* of 10 years of market exclusivity in the U.S. so CRMD's results would likely be far weaker than what Tauropharm has experienced. If that is what CRMD bulls are hanging their hats on, they are severely mistaken.

\*       \*       \*

Through four different analysis, we repeatedly arrive at a <$4m per year business after ~15 years of effort and with four different products. I would also note that

Tauropharm has been in the Middle East since at least 2007 so any CRMD touts claiming the Middle East will be a huge market for CRMD are clearly incorrect.

The reason for CRMD and Tauropharm's failure with Taurolidine catheter locks in Europe is that the European market is very similar to the U.S. in that there are already countless proven solutions which are nearly free.

*        *        *

### CRMD's Paid Stock Promotion

So how exactly did CRMD end up with one of the most unsophisticated retail message-board based shareholder bases I've ever seen? Was this an accident?

Unsurprisingly …. CRMD has a history of what seems to be paid stock promotion. For instance, this wildly promotional "Life Sci" report[5] appears made up to look like a real research report from a Wall Street bank. The fine print at the bottom of page 46 reveals the truth:

in the securities of the company that is the subject of this report. LifeSci Advisors has been compensated by the company that is the subject of this report for this and future research reports, investor relations services, and general

Or this comically bad "Griffin Securities" report[6] which on the surface appears almost real but, yet again, careful analysis of disclosures reveals the truth, where Griffin is apparently so bullish it won't even pay for the postage:

the Company, but in the future may from time to time engage in transactions with respect to the Company or other companies mentioned in the report. Griffin Securities from time to time in the future may request expenses to be paid for copying, printing, mailing and distribution of the report by the Company and other companies mentioned in this report. The Company is currently a client of Griffin Securities, Inc. Griffin Securities' services for the Company consist of non-investment banking securities-related services and non-securities services. Griffin Securities has received compensation from the Company in the past 12 months for non-investment banking services. Griffin Securities expects to receive, or intends to seek, compensation for investment banking services from the Company in the next three months.

### CRMD's Evercore Sale Process: Obviously Failed

Over 3 months ago, CRMD started a "strategic review" process that the company claimed would take a maximum of 6 months. Since then, both CRMD insiders and through their company's ATM have dumped hundreds of thousands of shares and made many open-market transactions. These were not 10b5-1 transactions which could potentially be protected from insider trading laws, these were straight-up open-market sell orders. Make no mistake, if CRMD had anything material and undisclosed going on, nobody would be making **any** open-market transactions - or they would be violating federal securities laws and should be in jail, there is no middle ground. The CRMD legal team would never allow it and it

---

[5]        http://www.lifesciadvisors.com/clientinfo/cormedix/Cormedix__Cormedix_LSA_Initiation_10-26-2010__clientinfo.pdf

[6] http://www.griffinsecurities.com/upload/reports/Griffin_CRMD_Initiation_Report_24Aug10.pdf

would be in jeopardy of horrific future lawsuits that would wipe it out personally. Furthermore, with the warrant exercises and cash on hand, CRMD already had 12m+ months of cash on hand without the ATM shares. Clearly, despite years of touting "partnership discussions" and even hiring Evercore, CRMD's strategic review process to sell the company has obviously failed.

 With all of this now understood, we can see the true pattern of CRMD and what is actually going on here.



CRMD has almost gone bankrupt several times and given a raging bull market for speculative biotech dreck, has seized the moment. Despite claiming the company is "in play" and with plenty of cash, CRMD claimed it wouldn't need to issue any stock but instead filed a huge ATM and immediately began dumping hundreds of thousands of shares of CRMD stock into the corresponding stock price rise largely created by confused retail shareholders. Literally, taking the cash from unsophisticated retail shareholders and putting into their worthless public shell where insiders it seems will collect yet another $15m of compensation and endlessly miss its own promises.

77.     As a result of this news, shares of CorMedix fell $0.81, or over 16.6%, on unusually heavy volume, to close at $4.05 on June 29, 2015.

78.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

40

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

79.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired CorMedix securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

80.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, CorMedix securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by CorMedix or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

81.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

82.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

83.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of CorMedix;

- whether the Individual Defendants caused CorMedix to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of CorMedix securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

84.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

85.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

497206.1

- the omissions and misrepresentations were material;

- CorMedix securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold CorMedix securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

86.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

87.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

88.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

89.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

90.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of CorMedix securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire CorMedix securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

91.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for CorMedix securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about CorMedix's finances and business prospects.

92.     By virtue of their positions at CorMedix, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants

44

acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

93.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of CorMedix securities from their personal portfolios.

94.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of CorMedix, the Individual Defendants had knowledge of the details of CorMedix's internal affairs.

95.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of CorMedix.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to CorMedix's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of CorMedix securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning CorMedix's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or

otherwise acquired CorMedix securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

96.     During the Class Period, CorMedix securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of CorMedix securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of CorMedix securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of CorMedix securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

97.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

98.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

497206.1

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

99.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

100.     During the Class Period, the Individual Defendants participated in the operation and management of CorMedix, and conducted and participated, directly and indirectly, in the conduct of CorMedix's business affairs.  Because of their senior positions, they knew the adverse non-public information about CorMedix's future prospects.

101.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to CorMedix's financial condition, and to correct promptly any public statements issued by CorMedix which had become materially false or misleading.

102.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which CorMedix disseminated in the marketplace during the Class Period concerning CorMedix's financial prospects.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause CorMedix to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of CorMedix within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of CorMedix securities.

103.     Each of the Individual Defendants, therefore, acted as a controlling person of CorMedix.  By reason of their senior management positions and/or being directors of CorMedix,

each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, CorMedix to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of CorMedix and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

104.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by CorMedix.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 6, 2015

Respectfully submitted,

**LITE DEPALMA GREENBERG, LLC**
*s/ Bruce D. Greenberg*
Bruce D. Greenberg

497206.1

570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
bgreenberg@litedepalma.com


**POMERANTZ, LLP**
Jeremy A. Lieberman
C. Dovi Berger
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
***Attorneys for Plaintiff***

497206.1

**EXHIBIT A**

**CORMEDIX, INC. (CRMD)**                                                                 **Li, Jie**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|
| 04/20/2015 | PUR | 50 | $8.2000 |

**EXHIBIT B**

# CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.  I, _____Jie Li_____, make this declaration pursuant

to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities

Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against CorMedix, Inc. ("CorMedix" or the "Company") and,

authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire CorMedix securities at the direction of plaintiffs' counsel or in order

to participate in any private action arising under the Securities Act or Exchange Act.

4.  I am willing to serve as a representative party on behalf of a Class of investors who purchased or

acquired CorMedix securities during the class period, including providing testimony at deposition and trial, if

necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions CorMedix

securities during the Class Period as specified in the Complaint.

6.  During the three-year period preceding the date on which this Certification is signed, I have not

sought to serve as a representative party on behalf of a class under the federal securities laws.

7.  I agree not to accept any payment for serving as a representative party on behalf of the class as set

forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses

directly relating to the representation of the class as ordered or approved by the Court.

8.  I declare under penalty of perjury that the foregoing is true and correct.


Executed _____July 2, 2015_____
              (Date)

                                    _____
                                              (Signature)


                                    _____Jie Li_____
                                    (Type or print Name)