**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JIE LI, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CORMEDIX, INC., ET AL.,<br><br>Defendants, | Case #: 3:15-cv-05264-PGS-DEA<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

## AMENDED CLASS ACTION COMPLAINT

Lead Plaintiff Elaine Wood and Plaintiff Richard Guthrie (together, "Plaintiffs"), by and through their counsel, individually and on behalf of all others similarly situated, for their Amended Class Action Complaint against defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, conversations with witnesses, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding CorMedix, Inc. ("CorMedix" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired CorMedix securities between June 24, 2014 and June 29, 2015, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials, as well as the "Promoter Defendants," as defined below.

2. While CorMedix styles itself as a company seeking to "in-license, develop and commercialize prophylactic and therapeutic products for the prevention and treatment of infectious diseases in cardiac, renal and oncology patients," in reality, Defendants built the Company on the false promise of a single product known as "Neutrolin" and public relations hype. Defendants tout Neutrolin as an infection reduction agent for patients undergoing treatment involving the use of central venous catheters. Catheter-related bloodstream infections can lead to treatment delays and substantial increases in costs to healthcare systems. The Company's stated intention is to target hemodialysis[1] care providers as the initial market for Neutrolin, and then expand the product's application to oncology/chemotherapy, total parenteral nutrition, and intensive care unit patients.

3. While the United States Food and Drug Administration ("FDA") has not yet approved Neutrolin, in July, 2013, the Company claimed the CE mark[2] in July 2013 and began

[1] Hemodialysis is the process by which patients with kidney disease filter and remove waste and extra fluid from the body. Hemodialysis uses a man-made membrane (dialyzer) to remove wastes, such as urea, from the blood, restore the proper balance of electrolytes in the blood, and eliminate extra fluid from the body.

[2] The "Conformite Europeenne" or CE marking certifies that a product has met EU health, safety, and environmental requirements, which ensure consumer safety. *See*

marketing and selling Neutrolin in Germany in December, 2013. Since that time, authorities in Austria, Italy, the Netherlands, Malta, and Saudi Arabia have approved the Neutrolin, and the Company has marketed and sold it in those countries.

4. Despite having sold Neutrolin abroad for nearly two years now, the Company continues to operate at a deficit. In short, CorMedix has needed—and continues to need—large periodic infusions of cash to continue funding its operations and to obtain FDA approval for Neutrolin, in turn, enabling it to market and sell the product in the United States.

5. To increase its liquidity and continue its operations, CorMedix has primarily relied upon equity financings. According to its Annual Report on Form 10-K for the year ended December 31, 2014, filed with the SEC on March 12, 2015 (the "2014 Form 10-K"), the Company raised well over $12 million in gross proceeds through the sale of convertible stock, warrants, and common stock over a period of little more than one year – from February 2013 to March 2014. Thus, it was critical for the Company to maintain its stock price as high as possible to maximize the cash it received from the offerings while avoiding excess dilution of the equity interests of the holders of outstanding shares.

6. To maintain its stock price at artificially inflated prices during the Class Period, Defendants engaged in a scheme to defraud unsuspecting shareholders, paying promoters, directly and indirectly, to publish overwhelmingly positive reports about the Company, its prospects, and its progress toward obtaining FDA approval for Neutrolin. Those schemes consisted of two separate promotional campaigns, conducted in June 2014 and March 2015, in which, with the knowledge or reckless disregard of Defendants, the Company paid Promoter Defendants (defined below) to tout the Company and its product, including its progress in

---

*http://www.export.gov/cemark/eg_main_017268.asp*. Manufacturers in the European Union (EU) and abroad must meet CE marking requirements where applicable in order to market their products in Europe").

securing FDA approval for Neutrolin and the Company's plans to expand its commercial distribution.

7. During the Class Period, however, as the stock price for CorMedix common stock rose at least in substantial part as a result of a paid promotional scheme rather than the disclosure of Company-specific, material, positive developments. Defendants' fraudulent schemes directly caused the price of CorMedix common stock to be artificially and substantially inflated during the Class Period. The success of these paid promotional campaigns was confirmed when the price of the Company's stock dropped soon after disclosure of the promotional scheme.

8. Moreover, Defendants compounded the fraudulent scheme by failing to disclose its existence and its actual effect on the Company's common stock price in certain risk disclosures about share price volatility. In public filings throughout the Class Period, Defendants discussed the risk of volatility of the Company's common stock price, detailing some of the factors that might give rise to or enhance that risk of volatility. Defendants failed, however, to disclose the nature and effect of their paid promotional schemes and the material factor on volatility that the schemes, themselves, comprised.

9. In addition, during the Class Period, in breach of its duty under Securities and Exchange Commission ("SEC") Rule S-K, Item 101, the Company failed to disclose adequately the considerable amount of competition which Neutrolin faces within its own market segment and Neutrolin's competitive position in relation to its market rivals.

10. On March 19, 2015, *TheStreetSweeper.org* published an article claiming that competition within the market for catheter lock solutions is "heavy," and that "more than a dozen clinical studies are already underway" to test combinations of the same ingredients found in Neutrolin. This claim renders false and misleading the statement made in CorMedix's 2014

Form 10-K, which identifies only five rival "product candidates," none of which contains a combination of the same ingredients as Neutrolin.

11. As a result of the publication of *TheStreetSweeper.org* article, the share price of CorMedix fell $0.42, or over 5%, on unusually heavy volume, to close at $7.93 on March 19, 2015.

12. On June 29, 2015, *SeekingAlpha.com* published an article authored by "The Pump Stopper," claiming that CorMedix had used undisclosed, paid stock promotions to increase the market price of its shares. The *SeekingAlpha.com* article stated in part that the Company has "a history of what seems to be paid stock promotion," and asserted that the compensation arrangements for the Company's stock promoters had not been adequately disclosed.

13. As a result of the publication of the *SeekingAlpha.com* article, the price of CorMedix shares fell $0.81, or over 16.6%, on unusually heavy volume, to as close at $4.05 on June 29, 2015.

14. As a direct and proximate result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and members of the Class have suffered significant damages.

## JURISDICTION AND VENUE

15. The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

17. Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b), as CorMedix is headquartered in this District and a significant portion of the defendants' actions, and the subsequent damages, took place within this District.

18. In connection with the acts, conduct and other wrongs alleged in this Amended Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

19. Lead Plaintiff Elaine Wood purchased the common stock of CorMedix during the Class Period, as set forth in the certification she presented to the Court in support of her motion for appointment as lead plaintiff, incorporated by reference herein, and has been damaged thereby.

20. Plaintiff Richard Guthrie purchased the common stock of CorMedix during the Class Period, as set forth in the certification attached hereto as Exhibit A and incorporated by reference herein, and has been damaged thereby.

21. Defendant CorMedix, Inc. ("CorMedix" or the "Company") is a Delaware corporation which maintains its principal executive offices at 1430 U.S. Highway 206, Suite 200, Bedminster, New Jersey 07921. CorMedix's common stock trades on the NYSE under the ticker symbol "CRMD."

22. Defendant Randy Milby ("Milby") has served as CorMedix's Chief Executive Officer and a Director since January 1, 2013. According to the Company's Proxy Statement, on Form 14A, filed with the SEC on April 22, 2015 ("2015 Proxy"), Milby "joined the Company in May 2012 to serve as our Chief Operating Officer pursuant to a consulting agreement with MW Bridges LLC, a Life Science consulting firm, of which Mr. Milby is Managing Partner."

23. Defendant Harry O'Grady ("O'Grady") has served since July 21, 2014 as the Company's Chief Financial Officer ("CFO") and Principal Financial and Accounting Officer. According to the 2015 Proxy, prior to his appointment at the Company, O'Grady "had been the Vice President, Finance, CFO, for Dey/Mylan Specialty, L.P. since 2010," was a "Vice President, Finance—Sterile Business Unit, at Catalent Pharma Solutions, Inc. from 2008 through 2010." From 2006 through 2008, O'Grady "was the Vice President, Business Planning and Administration, at Bayer Healthcare Pharmaceuticals, Inc." and, from 2004 through 2006, was "the Vice President, Finance and Controlling at Bayer."

24. Defendant Steven Lefkowitz ("Lefkowitz" and, with Milby and O'Grady, "Individual Defendants") has served as a Director at CorMedix since August 2011. According to the Company's website,[3] Lefkowitz "also served as the acting Chief Financial Officer from August 2013 to July 2014." Prior to that, Lefkowitz had been "the President and Founder of Wade Capital Corporation Money Purchase Plan, a financial advisory services company, since June 1990." Lefkowitz also "serves as a director in both publicly traded and privately held companies," including as "a director of Franklin Credit Management Corporation, formerly known as Franklin Credit Holding Corporation, a public specialty consumer finance company since 1996," "a director of AIS, RE., a privately held reinsurance company since 2001," and as "a director and chairman of the board of MedConx, Inc., a privately held medical devices connector company since 2007."

25. The following defendants are referred to collectively herein as the "Promoter Defendants":

---

[3] *See* *http://www.cormedix.com/#!bod/c1wqz*.

a. Defendant Crown Equity Holdings, Inc. ("Crown Equity"; OTC: "CRWE") is a publicly-traded Nevada corporation which maintains its principal executive offices at 11226 Pentland Downs St., Las Vegas, NV 89141;

b. Defendant Integrity IR LLC ("Integrity IR") is a Florida limited liability company which maintains its principal executive offices at 7491 N. Federal Hwy., Suite C5-323, Boca Raton, FL 33487

c. Defendant IntegritySolutionIR.com, Inc. ("Integrity Solution") is a wholly-owned subsidiary of Integrity IR. Integrity Solution is a Florida corporation which maintains its principal executive offices at 7491 N. Federal Hwy., Suite C5-323, Boca Raton, FL 33487; and

d. Defendant FiveDollarMovers.net ("FDM") is owned by Integrity IR, shares the same address as Integrity IR and Integrity Solution, and, as detailed below, is affiliated with both entities by virtue of their common owner, Joshua Yafa. FDM is a New York corporation which maintains its principal executive offices at 101 New York Avenue, New York, NY 10001.

## <u>SUBSTANTIVE ALLEGATIONS</u>

### *The Federal Securities Laws on Stock Promotion*

26. Section 17(b) of the Securities Act of 1933, 15 U.S.C. 77q(b), is commonly known as the "anti-touting" provision. It prohibits publicizing information about a security without "fully disclosing" any consideration received or to be received, directly or indirectly, from the issuer. *Id.*

27. Congress enacted the anti-touting provision in part to "meet the evils of the 'tipster sheet' as well as articles in newspapers or periodicals that purport to give an unbiased

opinion but which opinions in reality are bought and paid for."[4]

28. In an "Investor Alert" issued by its Office of Investor Education and Advocacy, dated June 2, 2014,[5] the SEC urges investors to "read carefully" newsletters and other promotional materials for information about whether the issuer compensated the promoter for a favorable article. In particular, the SEC cautions investors about promoters who disclosed not having received compensation or those that offer only vague disclosures – who fail specifically to disclose who paid them, the amount, and the type of payment. The SEC also warns investors of promoters' "disclosures [that] are difficult to find or appear in tiny, hard-to-read print": "Even if a newsletter makes specific disclosures about being compensated for promoting a stock," the SEC continued, "be aware that fraudsters may include such disclosures to create the false appearance that the newsletter is legitimate." CorMedix and the Promoter Defendants engaged in such schemes during the Class Period.

29. As detailed below, on two separate occasions during the Class Period, Defendants engaged in a paid-promotional bombardment of the market that directly, materially, and artificially affected the market price of CorMedix's common stock. The Promoter Defendants did not adequately disclose the compensation received, directly or indirectly, from the Company in exchange for their promotional publications.

30. As detailed below, neither the "General Disclaimer" accompanying Crown Equity's June 2014 promotional newsletters nor the "Full Disclaimer," to which the General Disclaimer refers and is linked, makes any statement concerning Crown Equity's receipt of compensation, directly or indirectly, from CorMedix in connection with its publication of the

---

[4] *S.E.C. v. Wall St. Pub. Inst., Inc.*, 851 F.2d 365, 376 (D.C. Cir. 1988) (*quoting* House Committee Report, H.R. Rep. No. 85, 73d Cong., 1st Sess. 6 (1933)).

[5] *http://investor.gov/news-alerts/investor-alerts/investor-alert-investment-newsletters-used-tools-fraud*

newsletters, or the amount thereof.

31. As detailed below, the "Legal Disclaimer" accompanying FDM's March 2015 promotional newsletters is rife with self-contradiction and, at certain key points, is unintelligible. On the one hand, FDM admits to having received compensation from CorMedix in connection with its publication of the newsletters; on the other, FDM appears to deny having been "hired" to "advertis[e]" the Company, while at the same time admitting it had entered into a "consulting agreement." Regardless, FDM's full disclaimer, to which the Legal Disclaimer is linked, makes clear that FDM had been compensated, directly or indirectly, by the Company. FDM, however, failed to specify who paid it for the March 2015 promotions and the amount of compensation FDM received, directly or indirectly, from CorMedix.

32. As detailed below, Defendants failed to disclose the existence of these promotional schemes and the effect they had on the volatility in the market price of the common stock of CorMedix.

***SEC Regulations Concerning Disclosure of "Competitive Conditions"***

33. SEC Regulation S-K, Item 101, 17 C.F.R. § 229.101, requires an issuer to disclose the following information in connection with its "narrative description" of its business:

> Competitive conditions in the business involved including, where material, the identity of the particular markets in which the registrant competes, an estimate of the number of competitors and the registrant's competitive position, if known or reasonably available to the registrant. Separate consideration shall be given to the principal products or services or classes of products or services of the segment, if any. Generally, the names of competitors need not be disclosed. The registrant may include such names, unless in the particular case the effect of including the names would be misleading. Where, however, the registrant knows or has reason to know that one or a small number of competitors is dominant in the industry it shall be identified. The principal methods of competition (e.g., price, service, warranty or product performance) shall be identified, and positive and negative factors pertaining to

> the competitive position of the registrant, to the extent that they exist, shall be explained if known or reasonably available to the registrant.

17 C.F.R. § 229.101(c)(x).

34. As detailed below, in its 2014 Form 10-K, CorMedix provided false and misleading information concerning the competitive conditions facing its product, Neutrolin. In its discussion of the "Competitive Landscape" for Neutrolin, the Company identified only five similar "product candidates." The Company, however, failed to disclose the existence of still other competitors within the market for catheter lock solutions, many of which were in the midst of either conducting or completing clinical trials.

35. As reported by *TheStreetSweeper.org* on March 19, 2015, just one week after the Company filed its 2014 Form 10-K with the SEC, however, "more than a dozen clinical studies [were] already underway" at that time, testing the combination of taurolidine, citrate and heparin, the components of Neutrolin. According to *ClinicalTrials.gov*, the governmental database maintained by the U.S. National Institutes of Health, at least 14 clinical studies testing various formulations containing taurolidine either were underway or had been completed as of the date on which the Company filed its 2014 Form 10-K.[6]

36. For example, among the entities that have sponsored or have collaborated on these studies was Geistlich Pharma AG ("Geistlich"). Geistlich is a Swiss company that markets a product known as "TauroSept," which is "an antimicrobial central vascular access device lock solution for the prevention and treatment of CVAD associated infections."[7] TauroSept contains 2% taurolidine solution (0.2 g /10 ml), sterile water for injections, 5% polyvinylpyrrolidone (PVP), and traces of HCl or NaOH to adjust the pH to 7.3. *See id.*

---

[6] *See https://www.clinicaltrials.gov/ct2/results?term=taurolidine&pg=1*.

[7] *See http://www.geistlich-pharma.com/en/pharmaceutical/products/taurosept/taurosept-crbsi/*.

37. According to *ClinicalTrials.gov*, Geistlich is collaborating on a study with Dr. Geert Wanten of Radboud University, the purpose of which is "to determine if TauroSept taurolidine 2% is more efficient than saline solution 0.9% as a catheter lock solution in preventing catheter related blood stream infections in patients with home parenteral nutrition." This study commenced in June 2013, and a detailed record of the study was submitted to *ClinicalTrials.gov* on March 5, 2013—more than two years before CorMedix filed its 2014 Form 10-K—but has not yet been completed.[8]

38. As detailed below, Defendants failed to disclose, among other things, the presence of Geistlich's TauroSept as a product candidate lying within Neutrolin's "Competitive Landscape."

39. Defendants omitted critical information concerning the highly competitive nature of the market for catheter lock solutions, including information concerning studies involving Geistlich's TauroSept, and misled investors into believing that Neutrolin faced a dearth of competition in its quest to become the first "pharmacologic agent[ ] approved in the U.S. for the prevention of CRBSIs [catheter-related bloodstream infections] in central venous catheters."

***Background***

40. CorMedix claims "to in-license, develop, and commercialize prophylactic and therapeutic products for the prevention and treatment of infectious diseases in cardiac, renal and oncology patients."

41. The Company's primary product is known as Neutrolin, which is a compound solution consisting of Taurolidine 1.35%, Citrate 3.5%, and Heparin 1000 units/mL. The Company claims that Neutrolin reduces the rate of infection in patients undergoing treatment

---

[8] According to *ClinicalTrials.gov*, however, this information was last updated in November 2014.

involving the use of central venous catheters. Catheter-related bloodstream infections can lead to treatment delays and substantial increases in costs to healthcare systems. As a "catheter lock solution," Neutrolin aims to reduce the incidence of such delays and costs by preventing the formation of harmful microorganisms and biofilm while the catheter is "locked," or not in use.

42. While the Company intends to target hemodialysis care providers as the initial market for Neutrolin, it believes the compound may also be used effectively in patients receiving chemotherapy, intravenous hydration, and intravenous medications via central venous catheters, and thus has identified the oncology market as a likely target for future expansion.

43. The Company has claimed CE mark approval for Neutrolin in Europe, but the product has not yet received FDA approval for use in the United States. According to the Company, FDA Phase III trials are set to commence in late 2015.

***The Company Needs Cash***

44. In Amendment 2 to its Form S-1 Registration Statement, which the Company filed with the SEC on January 20, 2010, CorMedix stated its intention to "submit an Investigational Device Exemption for CRMX003 [Neutrolin] by mid-2010, which if approved will enable us to start a pivotal clinical trial." On March 19, 2012, having not yet obtained FDA approval, CorMedix issued a press release, stating that it had "decided to change [its] business strategy and focus the majority of [its] resources" on the pursuit of "regulatory and commercialization approval for Neutrolin in Europe," and that, within the next 12 months, the Company would seek to "obtain Investigational New Drug approval from the FDA to begin clinical studies." In its Annual Report on Form 10-K for the year ended December 31, 2012, which was filed with the SEC on March 27, 2013, CorMedix stated that it would only "plan to resume dialogue with the FDA after we receive our CE Mark in the EU. We anticipate this will

be during the second half of 2013." The Company added that it "anticipate[d] our clinical trial program would begin sometime during the first half of 2014 and be completed in 2015 with NDA submission and potential approval in 2016."

45. CorMedix's forecasts proved wrong, and, by mid- to late-2013, the Company had reformulated its strategy, as evidenced by the Company's August 14, 2013 filing of its Quarterly Report on Form 10-Q for the period ended June 30, 2013 (the "June 30, 2013 10-Q"). In the June 30, 2013 10-Q, the Company stated that its revised strategy consisted of "four pillars": "(i) successfully launch the product in Germany; (ii) expand the product into additional applications; (iii) expand sales into other foreign countries; and (iv) apply for and receive marketing approval and launch the product in the United States." Thus, in light of the Company's "recent strategic changes," the Company "expect[s] our R&D expenditures to decrease and be primarily attributed to the CE Mark approval received in July 2013 and commercialization of Neutrolin in Europe." The Company noted that "[o]ur current focus on commercializing Neutrolin in Europe may impact our other development efforts and timelines" relating to the FDA trials and approval process.

46. The Company claimed its CE mark for Neutrolin in July 2013 and then began the commercial launch of the product in the fourth quarter of 2013. Evidently, however, sales of Neutrolin abroad were not as expected. In the 2014 Form 10-K, the Company reported only "approximately $2,000" in revenue for the year ended December 31, 2013. Further, according to the Company's Form 10-Q filed with the SEC on May 15, 2014, which covers the three-month period ended March 31, 2014, the Company reported only $12,203 in revenue generated from sales for the first quarter of 2014.

47. Thus, by the end of March 2014, having "not generated substantial revenue since [its] inception," having seen its progress toward FDA approval stall, and facing the prospect of incurring further significant expenses in connection with its commercialization of Neutrolin in Europe while seeking FDA approval in the U.S., the Company required an infusion of cash. In its Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2014, which was filed with the SEC on May 15, 2014, the Company admitted: "Because our business does not generate positive operating cash flow, we may need to raise additional capital before we exhaust our current cash resources in order to continue to fund our commercialization of Neutrolin and our research and development, as well as to fund operations generally." The Company, now in the midst of what it had described as an increasingly "costly and time consuming" process of seeking FDA approval for Neutrolin, was signaling to investors that it would soon need more cash despite the fact that, according to the 2014 Form 10-K, it had raised well over $12 million in gross proceeds through the sale of convertible stock, warrants, and common stock over a period of approximately one year, from February 2013 to March 2014.

***Crown Equity***

48. Crown Equity Holdings, Inc. bills itself as a provider of "advertising, branding, marketing solutions and services to boost customer awareness, as well as merchant visibility as a worldwide online multi-media publisher," especially within the securities industry.[9] Crown Equity seeks to provide "small to large companies and organizations" with "the online tools to inform the public, prospective customers, investors, partners, employees, and other stakeholders about their company leadership and products."

49. Crown Equity services its clients through, among other things, publishing and distributing "informational" electronic newsletters and alerts concerning its clients to its database

[9] *See* *http://www.crownequityholdings.com/about.html*.

of investors. Crown Equity markets itself as "a family of brands that work together to provide companies with a level of service unparalleled in the marketing industry." As detailed below, Crown Equity distributes its e-newsletters and alerts to investors under a variety of brand names, including "CRWE Finance," "CRWE Select," "Dr. Stock Pick," "Penny Omega," "Double In Stocks," "Stock Hot Tips," "Penny to Buck," and "Galaxy Stocks."

50. CorMedix, either directly or indirectly through an agent, entered into an agreement with Crown Equity by which Crown Equity would provide its marketing services for the benefit of the Company during the month of June 2014.

***The Promotion-Related Rise in the Price of CorMedix Shares in June 2014***

51. Between April 1 and late May, 2014, the price of CorMedix shares declined sharply from $2.38 to a low of $1.31 on May 23, 2014. This sharp decline was likely due, at least in part, to the May 15, 2014 filing of the Company's March 31, 2014 Form 10-Q with the SEC, which reported paltry sales figures for the first quarter of 2014. Subsequently, in late May, the share price achieved a high and remained relatively constant, fluctuating between a high of $1.62 and a low of $1.40. From April 1 through June 22, 2014, the average daily trading volume for the Company's stock was approximately 119,000 shares, with a high of 416,000 shares traded on April 15, 2014.

52. On June 23, 2014, the Company announced that it had finalized its proposed Phase III study protocol for submission to the FDA. At the close of the market that day, the price of the Company's stock was $1.49.

53. By the close of trading the next day, June 24, 2014, however, the price of CorMedix shares had soared from $1.49 to $1.92, an increase of approximately 29% in just 24 hours. On that date, trading was unusually heavy; indeed, the 738,700 shares traded on that day

alone nearly doubled the 416,000 shares that had been traded on April 15, 2014, and exceeded the average daily trading volume by a factor of nearly seven.

54. The dramatic rise in the value of CorMedix stock on June 24, 2014 cannot be explained entirely by the Company's submission of its proposed Phase III study protocol to the FDA. On that date, CorMedix received the benefit from paid promotions that caused its stock to rise artificially. The following graph illustrates the dramatic effect of undisclosed, paid promotion on the Company's common stock and how it significantly outpaced the broader market for pharmaceutical stocks:[10]




***The Company Needs Cash—Again***

55. Despite engaging Crown Equity to launch a paid promotional barrage directed at investors in late June, 2014, CorMedix found itself again in need of liquidity. Sales of Neutrolin

[10] The chart reflects a performance comparison, from June 15, 2014 through July 15, 2014, among CorMedix common stock and IHE, an "exchange traded fund" that tracks the investment results of Dow Jones U.S. Select Pharmaceuticals Index, and SPSIPH, the S&P Pharmaceuticals Select Industry Index.

abroad had not brought in the amount of revenue which the Company had expected. According to the 2014 Form 10-K, the Company reported that sales of Neutrolin in Europe and the Middle East brought in only $2,001 in 2013 and $189,274 in 2014. In light of the fact that, by the end of 2014, the Company was expecting to "incur increases in its cash used in operations as it continues to commercialize Neutrolin in Europe and other foreign markets, increases its business development activities, incurs additional legal costs to defend its intellectual property and seeks FDA approval of Neutrolin in the U.S.," the Company was forced to admit that a "substantial doubt" had been raised "about the Company's ability to continue as a going concern." The Company also reiterated its earlier statement that it would "need to raise additional capital before we exhaust our current cash resources in order to continue to fund our research and development, as well as to fund operations generally."

***Five Dollar Movers, Integrity Solution, and Integrity IR***

56. FDM is affiliated with Integrity Solution, a Florida corporation which is based in Boca Raton, Florida. FDM is a New York corporation engaged in stock promotion. Based on the text of the full Disclaimer appearing on FDM's website,[11] FDM is owned by Joshua Yafa, who "was criminally convicted in the matter of the United States District Court of the Southern District of New York Case Number S1 05 CR 1129-01 (VM) of violating" several provisions of federal securities laws, including "failure to disclose payment for advertising a security in connection with false disclosures concerning a payment for promoting A V L Global." Exhibit B. According to the text of FDM's full Disclaimer, "Mr. Yafa was sentenced to probation for a period of 60 months and ordered to pay disgorgement of $191,462." He was also "permanently restrained and enjoined from violating directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 and Sections 17(b) and 17(a) of the Securities Act." *Id.* The text of the

[11] *See* Exhibit B.

full Disclaimer further provides that "Mr. Yafa was also permanently barred from participating in an offer of penny stock including engaging in activities as a broker, dealer, or issuer for purposes of issuing, trading or inducing or attempting to induce the purchase or sale of a penny stock." *Id.*

57. Integrity Solution is an investor relations firm that markets itself as a provider of "an (exclusive) consulting service dedicated to stocks above $5.00."[12] It purports to "help emerging growth companies build a following among retail and institutional investors" by, among other things, publishing and distributing "a daily newsletter to feature its small cap stock picks, along with audio interviews and clients' financial news releases." It also publishes and distributes "stock charts, stock alerts, and investor fact sheets" to investors to help them "make informed decisions about the small cap stocks they are interested in."

58. Integrity IR is a Florida limited liability company which, according to the "Disclaimer" appearing on Integrity Solution's website, is the owner of Integrity Solution.[13] Integrity IR is "owned and controlled by Joshua Yafa." *See id.*

59. CorMedix, either directly or indirectly through an agent, entered into an agreement with FDM by which FDM would provide marketing services for the benefit of the Company during the month of March 2015.

***The Curious Rise in the Price of CorMedix Shares in March 2015***

60. In late February through the beginning of March, 2015, the price of CorMedix shares was hovering around $5.00, with trading volume averaging about 700,000 per day.

61. By 9:46 a.m. on the morning of March 4, 2015, the Company had announced that it had engage Evercore as a financial advisor in order to "explore strategic alternatives," and that

[12] *See http://integritysolutionir.com/about/.*
[13] *See* Integrity Solution Disclaimer, attached hereto as Exhibit O.

it had received a loan from an institutional investor, Elliott Management, which would provide a "backstop financing commitment." In the wake of these announcements, the price of the Company's common stock climbed from its closing price of $5.50 on March 3, 2015 to $6.16 by the close of trading on March 4, 2015.

62. Starting on March 6, 2015 and continuing until March 10, 2015, the price of the Company's stock skyrocketed. On March 5, the price of the Company's stock closed at $7.76. By the close of the market on March 10, 2015 its price had risen to $9.15, an increase of approximately 18% in the stock's value in less than one week. During the period March 6-10, trading volume averaged over 3.1 million shares per day.

63. Such a dramatic rise in the value of CorMedix stock on during the period March 6-10, 2015 cannot be explained by the Company's March 4 announcement that it had engaged Evercore as a financial advisor to explore strategic alternatives, or that the Company had obtained a loan from an institutional investor. Rather, from March 6-9, 2015, CorMedix received the benefit from a huge paid promotional campaign that caused its stock to rise artificially. Significantly, this campaign did not promote CorMedix based on either of the announcements made by the Company on March 4, 2015; indeed, the promotional material did not mention either event. The following graph illustrates the effect of undisclosed, paid promotion on the Company's common stock and how it significantly outpaced the broader market for pharmaceutical stocks:[14]

[14] The chart reflects a performance comparison, from March 1, 2015 through March 31, 2015, among CorMedix common stock and IHE, an "exchange traded fund" that tracks the investment results of Dow Jones U.S. Select Pharmaceuticals Index, and SPSIPH, the S&P Pharmaceuticals Select Industry Index.




64. On March 11, 2015, following the conclusion of the paid promotional campaign conducted by FDM, Integrity Solution and/or Integrity IR over the previous week, detailed below, the price of CorMedix dropped from a close of $9.15 on March 10, 2015 to close at $8.06 on March 11, 2015, which constituted a decline of nearly 12% in the value of the stock.

## SCHEME TO DEFRAUD

65. With no material, positive developments relating to the intrinsic value of CorMedix during late June 2014, and again during early March 2015, the only events that could cause its share prices to rise so substantially were its undisclosed (or inadequately disclosed), paid promotional campaigns conducted by Crown Equity, FDM, Integrity Solution and/or Integrity IR. Nothing distinguished the Company from its competitors in the market for catheter lock solutions or the broader market, other than its undisclosed (or inadequately disclosed), paid promotional scheme.

66. Indeed, the Company, in concert with Crown Equity in June 2014, and with FDM, Integrity Solution and/or Integrity IR in March 2015, sought to pump its stock under the guise of

widely circulated "newsletters" and "alerts," purportedly authored by objective analysts and observers. The Company had engaged in a concerted effort in June 2014 and March 2015 to conceal the true source of these promotional materials and to persuade the investing public that the information being presented was coming from parties not affiliated with CorMedix. Although these materials purported to provide investors with detailed "disclaimers" alongside the investing guidance and updates, in fact they gave readers little or no notice that the information came, directly or indirectly, from the Company. Lengthy, fine-print disclosures appearing at the very end of the materials contained buried references to entities having no apparent connection to CorMedix. The hidden truth, however, was that CorMedix had paid, either directly or indirectly through an agent, FDM to publicize the Company's stock in at least 11 different publications during the Class Period.

67. In June, 2014, CorMedix, either directly or through an agent, paid Crown Equity to conduct a massive, one-day, promotional barrage, which consisted of the publication of a single "informational" bulletin concerning the Company in at least eight different media outlets, including (1) *crwefinance.com*, (2) *crweselect.com*, (3) *drstockpick.com*, (4) *pennyomega.com*, (5) *doubleinstocks.com*, (6) *stockhottips.com*, (7) *pennytobuck.com*, and (8) *galaxystocks.com*, to tout the Company's stock.

68. In March 2015, CorMedix, either directly or indirectly through an agent, paid FDM to conduct a promotional campaign, which consisted of the publication of nearly identical "informational" bulletins concerning the Company on March 5, 8, and 9, 2015 by FDM.

69. Defendants' paid promotional campaigns in June, 2014 and March, 2015 were deceptive, in that they concealed the true source of the information being presented, and successful, in that they directly and materially affected the price of Cormedix's common stock.

***June 2014 Promotions***

70. On June 24, 2014, Crown Equity published an "informational" newsletter that appeared in eight of its affiliated online publications: (1) *crwefinance.com* (attached hereto as Exhibit C); (2) *crweselect.com* (attached hereto as Exhibit D); (3) *drstockpick.com* (attached hereto as Exhibit E); (4) *pennyomega.com* (attached hereto as Exhibit F); (5) *doubleinstocks.com* (attached hereto as Exhibit G); (6) *stockhottips.com* (attached hereto as Exhibit H); (7) *pennytobuck.com* (attached hereto as Exhibit I); and (8) *galaxystocks.com* (attached hereto as Exhibit J). This newsletter, which promotes investment not only in CorMedix but in a company known as Alimera Sciences, Inc. as well, was distributed to subscribers of each publication.

71. The June 24, 2014 newsletter's discussion of CorMedix highlights the "indispensable" nature of intravascular catheters in "modern-day medical practice," and claims that "[h]ealth-care institutions purchase millions of intravascular catheters each year." Exhibits C-J. It then asserts that the use of the Company's product, Neutrolin, which is a "broad-spectrum antimicrobial/antifungal and anticoagulant combination that is active against common microbes," will "significantly reduce the incidence of [catheter-related bloodstream infections], thus reducing the need for local and systemic antibiotics while prolonging catheter life." *Id.* In light of the above, and the supposed "progress" which the Company has made during negotiations with the FDA over its Phase III study, the newsletter emphasizes (in boldface type) that "Neutrolin is well positioned to unlock significant shareholder value." *Id.*

72. Following the June 24, 2014 newsletter's discussion of CorMedix appears a link to the Company's website, which in turn is followed by a discussion of Alimera Sciences, Inc. *See* Exhibits C-J. This presentation format employs a deceptive technique to conceal the promotional nature of the publication. By linking its paid research on CorMedix to unpaid

research on a larger, more established company like Alimera Sciences,[15] Crown Equity is able to create the impression that the information being presented in its newsletter is unbiased and contains objective information. Meanwhile, the newsletter draws the attention of investors who already are familiar with Alimera Sciences towards the smaller company, CorMedix, and seeks to foster a belief that the two companies are on parallel developments tracks, with Alimera Sciences merely being further along its path to commercial success. Therefore, Crown Equity's newsletter touts CorMedix based not only on the Company's own supposed merits, but also through its association with Alimera Sciences.

73. Below the June 24, 2014 newsletter's discussion of Alimera Sciences appears a lengthy "General Disclaimer," along with other information concerning subscription to the newsletter. *See* Exhibits C-J. The General Disclaimer provides no information concerning the amount of compensation that Crown Equity received from the Company in connection with the publication of this newsletter. In fact, the General Disclaimer wholly fails to disclose Crown Equity's receipt of any compensation whatsoever from the Company or any of its affiliates or agents.

---

[15] Alimera Sciences, Inc. (NYSE: ALIM) was founded in June 2003 and, according to its website (*http://www.alimerasciences.com/about-us/*) is "a pharmaceutical company that specializes in the research, development and commercialization of prescription ophthalmic pharmaceuticals." As of the time of the June 2014 promotions, Alimera Sciences was trading at around $6 per share. Its primary product, ILUVIEN, received FDA approval in September 2014 and has received marketing authorization approvals in Austria, Belgium, the Czech Republic, Denmark, Finland, France, Germany, Ireland, Italy, Luxembourg, the Netherlands, Norway, Poland, Portugal, Spain, Sweden and the United Kingdom. Alimera Sciences has 70 full-time employees and a market cap of approximately $137 million. By comparison, CorMedix trades at around $2 per share; is still seeking FDA approval for Neutrolin; has received marketing authorization in Austria, Italy, the Netherlands, Malta, and Saudi Arabia; has five full-time employees; and has a market cap of approximately $84 million.

74. The General Disclaimer to the June 24, 2014 newsletter contains a link to Crown Equity's "Full Disclaimer."[16] Like the General Disclaimer, however, the Full Disclaimer contains no statement regarding Crown Equity's receipt of compensation from either CorMedix or its agents, or the amount thereof.

75. Crown Equity's June 24, 2014 paid promotional campaign on behalf of CorMedix had the effect that the Defendants and the promoters intended. On June 23, 2014, the day before the Crown Equity conducted its promotional blitz, the per-share price of CorMedix common stock closed at $1.49. The price of its stock rose by approximately 29% in just 24 hours to close at $1.92 on June 24, 2014.

76. At the same time, the market for the industry generally, as represented by the S&P Pharmaceuticals Select Industry Index, fell from 5,307.57 to 5,293.38, a decline of 0.3%. Meanwhile, the broader market, as represented by the S&P Index, fell from 1,962.61 to 1,949.98, a decline of 0.6%. Nothing but undisclosed paid promotions explains the vast difference between the rise in CorMedix's per-share price and the performance of the broader market.

***March 2015 Promotions***

77. On March 5, 8, and 9, 2015, FDM published a series of three stock alerts promoting CorMedix. None mentions the agreement between CorMedix and Evercore and none mentions the cash infusion from Elliott Management.[17] Each of the three alerts consists of a short message from FDM, followed by a short description of the Company, which was identical for each of the March 2015 alerts and states as follows:

About CorMedix Inc.

[16] *See* Exhibit K, attached hereto.
[17] Copies of the March 5, 2015, March 8, 2015, and March 9, 2015 promotions published by FDM are attached hereto as Exhibits L, M, and O, respectively.

> CorMedix Inc. is a commercial-stage pharmaceutical company that seeks to in-license, develop and commercialize therapeutic products for the prevention and treatment of cardiac, renal and infectious diseases. CorMedix's first commercial product in Europe is Neutrolin, a catheter lock solution for the prevention of catheter related bloodstream infections and maintenance of catheter patency in tunneled, cuffed, central venous catheters used for vascular access in hemodialysis patients, in addition to oncology patients, critical care, patients including neonates, and patients receiving total parenteral nutrition, IV hydration, and/or IV medications. Please see the company's website at www.cormedix.com for additional information. Plans are in progress to expand commercial distribution into the United States, Asia, the Middle East, South America and Africa upon appropriate regulatory approval.[18]

78. Above FDM'S description of the Company in its March 5, 2015 alert appeared the following short message, which is addressed to subscribers of FDM, Integrity Solution and/or Integrity IR's newsletters and alerts:

> Thursday 11PM
>
> Many readers have asked recently for another momentum play. Watch CRMD tomorrow morning
>
> Stock closed: $7.76
>
> First Resistance: $8.85[19]

79. Above FDM's description of the Company in its March 8, 2015 alert appeared the following short message, which is addressed to subscribers of FDM, Integrity Solution and/or Integrity IR's newsletters and alerts:

> Sunday 11AM (Ps, I sent a message last night, that looked crazy, I was way to [*sic*] tired to send such a message)
>
> Do you use where CRMD closed on Friday? Proving my momentum finder is kicking butt!
>
> CRMD closed at $8.34 on Friday.

---

[18] *See* Exhibits L, M, and N, attached hereto.
[19] *See* Exhibit L, attached hereto.

> Even if Joe investor only bought 10,000 shares of CRMD, Joe investor could have made about $4,000 profits (minus comm., and taxes) for about 3 hours of work. (Tough day huh)
>
> Original email below
>
> Thursday 11PM
>
> Many readers have asked recently for another momentum play. Watch CRMD tomorrow morning
>
> Stock closed: $7.76
>
> First Resistance: $8.85[20]

80. Above FDM's description of the Company in its March 9, 2015 alert appeared the following short message, which is addressed to subscribers of FDM, Integrity Solution and/or Integrity IR's newsletters and alerts:

> Monday 10:30PM
>
> CRMD which is my 3rd momentum play in a row hits $9.34 today, blazing a trail up from $7 bucks in just a couple days a go when I gave it to you.
>
> Example: Average joe investor just buys 10,000 shares of CRMD and sits on it for a couple days. Joe is now up over $20k CASH!!!
>
> Not bad joe.
>
> Not bad FDM, its your 3rd pick in a row like this. "Little pat on your back"
>
> While most nomads are trying to figure out how to BUY leads and hope and pray the leads will be the answer to the equation, little do these elves realize the power lies in the countless hours of research picking winner after winner![21]

81. In each of the March 2015 promotions, below the corporate description of CorMedix appears a lengthy fine-print "Legal Disclaimer," the length of which exceeded the length of the text of the March 5, 8, and 9, 2015 stock alerts published by FDM. At the very end

---

[20] *See* Exhibit M, attached hereto.
[21] *See* Exhibit N, attached hereto.

of the Legal Disclaimer appears the following statement:

> Pursuant to a CONSULTING AGREEMENT "Fivedollarmovers.net/ISI," which was not hired for a advertising crmd beginning on 3/4/2015 ending 3/22/2015 disseminate information about crmd, NO PAYMENT for compensation, and NO stock was bought or given as compensation. No compensation for crmd, own zero shares. READ ENTIRE Disclaimer --> http://fivedollarmovers.net/Disclaimer.php[22]

82. The Legal Disclaimer quoted above in Paragraph 81 is largely incomprehensible and seemingly self-contradictory. It purports to admit the existence of a "CONSULTING AGREEMENT" between FDM and the Company, but then purports to claim that FDM has received "NO PAYMENT for compensation" from the Company. Regardless of the intended meaning of the Legal Disclaimer, however, the "ENTIRE Disclaimer," to which the Legal Disclaimer is linked, clears up any confusion. Investors, however, must click through to the Entire Disclaimer.

83. FDM's full Disclaimer[23] states, in pertinent part, that "we publish the Information because we are compensated to do so. We receive monetary and/or securities compensation of the Profiled Issuers we promote. Our compensation is paid by the Profiled Issuers, third party stakeholders of the Profiled Issuers or intermediaries."[24] The full Disclaimer, however, does not specify who paid FDM or what amount of monetary or securities compensation FDM received in connection with the March 2015 promotions.

84. FDM, Integrity Solution and/or Integrity IR's March 5-9, 2015 paid promotional campaign on behalf of CorMedix had the effect that the Defendants and the promoters intended. At the close of the market on March 5, 2015, just hours before FDM began to conduct its promotional blitz later that night, the per-share price of CorMedix common stock closed at

[22] *See* Exhibits L, M, and N, attached hereto.
[23] *See* Exhibit B.
[24] *See* Exhibit B.

$7.76, the market price's already having absorbed the information concerning the Evercore Agreement and the cash infusion from Elliott Management. Without any material change in the Company's operating or financial circumstances, the price of its stock rose by approximately 18% in just five days to close at $9.15 on March 10, 2015.

85. During the same period, the market for the industry generally, as represented by the S&P Pharmaceuticals Select Industry Index, fell from 6,774.47 to 6,631.84, a decline of 2.1%. Meanwhile, the broader market, as represented by the S&P Index, fell from 2,101.04 to 2,044.16, a decline of 2.7%. Nothing but undisclosed paid promotions explains the vast difference between the rise in CorMedix's per-share price and the performance of the broader market.

**FALSE AND MISLEADING STATEMENTS**

86. On August 14, 2014, the Company filed with the SEC a Quarterly Report on Form 10-Q for the period ended June 30, 2014 (the "June 30, 2014 10-Q"). Beginning on page 30, the June 30, 2014 10-Q includes a section entitled "Risk Factors," which, among other things, details certain risks related to CorMedix's common stock. It states that, "[e]xcept as set forth below, there have been no material changes to the discussion of risk factors included in our most recent Annual Report on Form 10-K." The June 30, 2014 10-Q discloses only the risk that, according to CorMedix, "[i]f we fail to comply with the continued listing standards of the NYSE MKT, it may result in a delisting of our common stock from the exchange."

87. As of August 14, 2014, the most recent Annual Report on Form 10-K was filed by the Company with the SEC on March 31, 2014. Beginning on page 19 of the Annual Report on Form 10-K for the year ended December 31, 2013, filed with the SEC on March 31, 2014 (the "2013 Form 10-K"), the Company identifies certain "Risks Related to Our Common Stock,"

which include the following:

> (1) "We have identified a material weakness in our internal control over financial reporting, and our internal control over financial reporting and our disclosure controls and procedures may not prevent all possible errors that could occur";
>
> (2) "Our stock price has fluctuated considerably and is likely to remain volatile, in part due to the limited market for our common stock and you could lose all or a part of your investment";
>
> (3) "A significant number of additional shares of our common stock may be issued at a later date, and their sale could depress the market price of our common stock";
>
> (4) "We will need additional financing to fund our activities in the future, which likely will dilute our stockholders";
>
> (5) "Future sales and issuances of our equity securities or rights to purchase our equity securities, including pursuant to equity incentive plans, would result in additional dilution of the percentage ownership of our stockholders and could cause our stock price to fall";
>
> (6) "Provisions in our corporate charter documents and under Delaware law could make an acquisition of us, which may be beneficial to our stockholders, more difficult";
>
> (7) "If we fail to comply with the continued listing standards of the NYSE MKT, it may result in a delisting of our common stock from the exchange";
>
> (8) "Because the average daily trading volume of our common stock has been low historically, the ability to sell our shares in the secondary trading market may be limited";
>
> (9) "Penny stock regulations may impose certain restrictions on marketability of our securities"; and
>
> (10) "We do not intend to pay dividends on our common stock so any returns on our common stock will be limited to the value of our common stock."

88. The foregoing disclosures concerning risk relating to the Company's common stock were false and misleading because, as stated above in ¶¶ 65-85, Defendants knew or

recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost CorMedix's stock price artificially through paid promotions. Having disclosed these risks concerning the Company's common stock, Defendants were duty bound, but failed, to disclose the risk to its common stock relating to the paid-promotions scheme.

89. On November 13, 2014, the Company filed with the SEC a Quarterly Report on Form 10-Q for the period ended September 30, 2014 (the "September 30, 2014 10-Q"). The September 30, 2014 10-Q incorporates by reference the risk disclosures made in the 2013 Form 10-K.

90. The foregoing disclosures concerning risk relating to the Company's common stock were false and misleading because, as stated above in ¶¶ 65-85, Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost CorMedix's stock price artificially through paid promotions. Having disclosed these risks concerning the Company's common stock, Defendants were duty bound, but failed, to disclose the risk to its common stock relating to the paid-promotions scheme.

91. On March 12, 2015, the Company filed with the SEC the 2014 Form 10-K. Beginning on page 25 of 2014 Form 10-K, the Company identifies certain "Risks Related to Our Common Stock," which include the following:

> (1) "We have identified a material weakness in our internal control over financial reporting, and our internal control over financial reporting and our disclosure controls and procedures may not prevent all possible errors that could occur";
>
> (2) "Our common stock price has fluctuated considerably and is likely to remain volatile, in part due to the limited market for our common stock and you could lose all or a part of your investment";
>
> (3) "A significant number of additional shares of our common stock may be issued at a later date, and their sale could depress the market price of our common stock";

(4) "We will need additional financing to fund our activities in the future, which likely will dilute our stockholders";

(5) "Future sales and issuances of our equity securities or rights to purchase our equity securities, including pursuant to equity incentive plans, would result in additional dilution of the percentage ownership of our stockholders and could cause our stock price to fall";

(6) "Provisions in our corporate charter documents and under "A significant number of additional shares of our common stock may be issued at a later date, and their sale could depress the market price of our common stock";Delaware law could make an acquisition of us, which may be beneficial to our stockholders, more difficult";

(7) "If we fail to comply with the continued listing standards of the NYSE MKT, it may result in a delisting of our common stock from the exchange";

(8) "Because the average daily trading volume of our common stock has been low historically, the ability to sell our shares in the secondary trading market may be limited";

(9) "Penny stock regulations may impose certain restrictions on marketability of our securities"; and

(10) "We do not intend to pay dividends on our common stock so any returns on our common stock will be limited to the value of our common stock."

92. The foregoing disclosures concerning risk relating to the Company's common stock were false and misleading because, as stated above in ¶¶ 65-85, Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost CorMedix's stock price artificially through paid promotions. Having disclosed these risks concerning the Company's common stock, Defendants were duty bound, but failed, to disclose the risk to its common stock relating to the paid-promotions scheme.

93. Beginning on page 5, the 2014 Form 10-K includes a section concerning CorMedix's "Corporate History and Information." Within that section, beginning on page 7, is a

subsection that details the "Competitive Landscape" for the Company's product, Neutrolin. In that subsection, the Company states that, "[t]o the best of its knowledge, the following product candidates have been recognized for the prevention and treatment of catheter-related blood stream infections":

> - TauroLock, manufactured by Tauro-Implant (Winsen, Germany). TauroLock has received a CE Mark and is distributed in 25 countries. It has anti-microbial and anti-coagulant activity and contains a combination of citrate 4% with (cyclo)-taurolidine and heparin or urokinase. TauroLock has four formulations: TauroLock, Tauro_lock Heparin 100, TauroLock Heparin 500 and TauroLock Urokinase 2500IU.
>
> - Zuragen, being developed by Ash Access Technology (Lafayette, IN). It has antimicrobial and anticoagulant activity and contains methylene blue, parabens and 7% citrate.
>
> - B-Lock, being developed by Great Lakes Pharmaceuticals Inc. (Cleveland, OH). It has anti-microbial, anti-coagulant and anti-fungal activity and contains trimethoprim, EDTA and ethanol combinations. Initiated study in 2012 in Poland and Hungary to support CE Mark in European Union.
>
> - DuraLock-C, manufactured by Medical Components, Inc. (Harleysville, PA). DuraLock-C received a CE Mark and is distributed in a number of European Union countries. It has anti-microbial and anti-thrombosis activity and contains trisodium citrate in 46.7%, 30% and 4% concentrations.
>
> - IntraLock, manufactured by Fresenius Medical Care AG & Co. (Bad Homburg, Germany). IntraLock received a CE Mark and is distributed in a number of European Union countries. It is an anticoagulant solution to prevent thrombus formation in catheters. IntraLock contains citrate (4%) for anticoagulation and a small amount of polyhexanide for preservation.
>
> Antibiotic or antimicrobial coated catheters have been launched by some device companies as short term prevention of catheter infection. These are not effective for hemodialysis

> catheters due to the long term use and high blood flow associated with hemodialysis.

94. The foregoing statements about the "Competitive Landscape" for Neutrolin are false and misleading. Defendants knew or recklessly disregarded that, in violation of SEC Regulation S-K, Item 101, 17 C.F.R. § 229.101, their disclosure in the 2014 Form 10-K omits critical information about Neutrolin's competitive landscape which was required to be disclosed, including "an estimate of the number of competitors and the registrant's competitive position," "[t]he principal methods of competition," and the "positive and negative factors pertaining to the competitive position of the registrant."

95. Defendants' omission of critical information concerning their competitive standing, which must be disclosed in accordance with SEC regulations, especially when combined with certain other false and misleading statements made in the Company's 2014 Form 10-K, shielded from investors the highly competitive nature of the market for catheter lock solutions and misled them into mistakenly believing that CorMedix was facing little or no competition in its quest to have Neutrolin become the first "pharmacologic agent[ ] approved in the U.S. for the prevention of CRBSIs [catheter-related bloodstream infections] in central venous catheters."

96. On May 7, 2015, the Company filed with the SEC a Quarterly Report on Form 10-Q for the period ended March 31, 2015 (the "March 31, 2015 10-Q"). The March 31, 2015 10-Q incorporates by reference the risk disclosures set forth in the 2014 Form 10-K.

97. The foregoing disclosures concerning risk relating to the Company's common stock were false and misleading because, as stated above in ¶¶ 65-85, Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost CorMedix's stock price artificially through paid promotions. Having disclosed these risks

concerning the Company's common stock, Defendants were duty bound, but failed, to disclose the risk to its common stock relating to the paid-promotions scheme.

## THE TRUTH EMERGES

98. On March 19, 2015, *TheStreetSweeper.org* published an article claiming that competition within the market for catheter lock solutions is "heavy," and that "more than a dozen clinical studies are already underway" to test combinations of the same ingredients found in Neutrolin. This claim renders false and misleading the statement made in CorMedix's 2014 Form 10-K, which identifies only five rival "product candidates," none of which contains a combination of the same ingredients as Neutrolin.

99. As a result of the publication of *TheStreetSweeper.org* article, the share price of CorMedix fell $0.42, or over 5%, on unusually heavy volume, to close at $7.93 on March 19, 2015.

100. On June 29, 2015, *SeekingAlpha.com* published an article authored by "The Pump Stopper," who claimed that CorMedix was using undisclosed, paid stock promotions to increase the value of its shares. The *SeekingAlpha.com* article stated in part that the Company has "a history of what seems to be paid stock promotion," and asserted that the compensation arrangements for the Company's stock promoters have not been adequately disclosed.

101. As a result of the publication of the *SeekingAlpha.com* article, the price of CorMedix shares fell $0.81, or over 16.6%, on unusually heavy volume, to as close at $4.05 on June 29, 2015.

102. As a direct and proximate result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and their fellow Class members have suffered significant damages.

## CLASS ACTION ALLEGATIONS

103. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired CorMedix securities traded on NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

104. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, CorMedix securities were actively traded on NYSE MKT, an exchange for small-cap companies, "designed to support younger, high-growth companies." While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. CorMedix or its transfer agent maintains a list of record owners, enabling it to identify other members of the Class and to issue notice of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

105. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

106. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

107. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of CorMedix;

(c) whether the Individual Defendants caused CorMedix to issue false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of CorMedix securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

96. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**APPLICATION OF PRESUMPTION**
**OF RELIANCE: FRAUD ON THE MARKET**

97. Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine. At all relevant times, the market for CorMedix common stock was efficient for the following reasons, among others:

(a) For most of the Class Period, CorMedix's shares of common stock traded on the NYSE MKT;

(b) As a regulated issuer, CorMedix filed periodic public reports with the SEC;

(c) CorMedix regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

(d) During the Class Period, the average daily trading volume in CorMedix's shares was 160,818 shares or weekly average trading volume of approximately 735,502 shares. As of March 9, 2015, the number of outstanding shares of the registrant's common stock was 24,122,522. With a public float of approximately 21.6 million shares, 0.7% of the float traded daily and approximately 3.4% of the float trading weekly, establishing a strong presumption that the market for its stock was efficient; and

(e) The Company's stock price rapidly incorporated new, company-specific information.

98. As a result of the foregoing, the market for CorMedix's common stock promptly digested current information regarding CorMedix from all publicly available sources and reflected such information in CorMedix's stock price. Under these circumstances, all purchasers

of CorMedix's common stock during the Class Period suffered similar injury through their purchase of CorMedix's common stock at artificially inflated prices, and a presumption of reliance applies. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

99. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**FIRST CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

100. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

101. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

102. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of CorMedix securities during the Class Period.

103. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for CorMedix securities. Plaintiffs and the Class would not have purchased CorMedix securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**SECOND CLAIM**
**Violation of Section 10(B) of the Exchange Act and**
**Rule 10b-5(a) and (c) Promulgated Thereunder against all Defendants**

104. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

105. During the Class Period, Defendants violated Rules 10b-5(a) & (c) in that they employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of CorMedix publicly traded common stock during the Class Period as alleged herein. Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase CorMedix's common stock at artificially inflated prices. In furtherance of these unlawful schemes, plans and courses of conduct, Defendants, and each of them, took the actions set forth herein.

106. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock to maintain

artificially high market prices for CorMedix's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

107. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct, including causing the publication of undisclosed, paid promotions. By paying for, approving, creating and/or publishing paid promotional materials without disclosing that CorMedix or its agents paid for the creation and dissemination of those materials, Defendants employed devices, schemes and artifices to defraud, engaged in acts, practices, and a course of conduct designed artificially to inflate the price of CorMedix common stock and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of CorMedix common stock during the Class Period.

108. Defendants knew of the devices, schemes, and artifices to defraud or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of supporting the artificially inflated price of CorMedix's securities.

109. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for CorMedix publicly traded securities. Plaintiffs and the Class would not have purchased CorMedix's publicly traded securities at the prices they paid, or at all, had they been aware that the market prices for CorMedix's common stock had been artificially inflated by Defendants' devices, schemes, and artifices to defraud.

**<u>THIRD CLAIM</u>**
**Violation of Section 20(a) of the Exchange Act**
**<u>Against the Defendants Milby, O'Grady, Lefkowitz, and CorMedix</u>**

110. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

111. Plaintiffs sue Defendants Milby, O'Grady, and Lefkowitz herein as controlling persons of CorMedix and the Promoter Defendants. Plaintiffs sue Defendant CorMedix as a controlling person of the Promoter Defendants.

112. By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness and/or intimate knowledge of the misleading statements disseminated to the investing public, Defendants Milby, O'Grady, and Lefkowitz had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the primary violators, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. In particular, Defendants Milby, O'Grady, and Lefkowitz had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

113. In particular, Defendants named in this count had direct and supervisory involvement in the day-to-day operations of CorMedix and/or the Promoter Defendants and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein. Those Defendants exercised that power.

114. As set forth above, CorMedix and the Promoter Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

115. By virtue of their and its position as controlling persons, Defendants Milby, O'Grady, Lefkowitz, and CorMedix are liable pursuant to Section 20(a) of the Exchange Act. As

a direct and proximate result of their wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

116. This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating Elaine Wood Richard Guthrie as Representative Plaintiffs and certifying them as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other relief as deemed appropriate by the Court.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## JURY TRIAL DEMANDED

117. Plaintiffs hereby demand a trial by jury.

Dated: December 1, 2015

Respectfully Submitted:

**THE ROSEN LAW FIRM, P.A.**

/s/ *Laurence Rosen*
Laurence Rosen
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

and

**THE ROSEN LAW FIRM, P.A.**
Jacob A. Goldberg
Keith Lorenze
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Tel: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com
klorenze@rosenlegal.com

***Lead Counsel for Lead Plaintiff and the Proposed Class***

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 1, 2015, I electronically filed the foregoing ***Amended Class Action Complaint*** with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

**THE ROSEN LAW FIRM, P.A.**

By: */s/ Laurence Rosen*

**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

***Lead Counsel for Lead Plaintiff and the Class***